**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **DYTAUN MONTGOMERY**<br>**2643 Hamilton Place, Apt. 103**<br>**Waldorf, MD 20602** | ) ) ) ) | |
| *Plaintiff,* | ) ) | **Case No. 22-1715** |
| **v.** | ) ) | **Jury Trial Demand** |
| **DENIS MCDONOUGH, Secretary,**<br>**U.S. DEPARTMENT OF VETERANS AFFAIRS**<br>**810 Vermont Avenue, N.W.**<br>**Washington D.C. 20420** | ) ) ) ) ) | |
| *Defendant.* | ) ) | |

## COMPLAINT

Plaintiff Dytaun Montgomery (hereinafter "Plaintiff" or "Ms. Montgomery"), by and through her attorneys, hereby files this Complaint against Defendant Denis McDonough, Secretary, U.S. Department of Veterans Affairs (hereinafter "Defendant," "VA," or the "Agency"). Plaintiff seeks relief pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII") and Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791, 29 C.F.R. § 1614.203(c), 29 C.F.R. § 1630.9(a), Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111 ("Section 501") and seeks damages including but not limited to declaratory, injunctive, and other equitable relief; compensatory damages; litigation expenses and reasonable attorneys' fees based on Defendant's discriminatory, harassing, retaliatory, and otherwise unlawful actions against Plaintiff Montgomery.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e *et seq*.

2.      Plaintiff has exhausted all administrative remedies prior to filing suit.

3.      Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) in that all or some events or omissions giving rise to Plaintiff's claims occurred in this judicial district, and Defendant may be found in this judicial district.

## PARTIES

4.      Plaintiff Dytaun Montgomery is an African American female with permanent severe hearing loss in her left ear, which limits her ability to hear. Ms. Montgomery is a former employee of the U.S. Department of Veteran's Affairs and a resident of the State of Maryland.

5.      Defendant Denis McDonough is the Secretary of the U.S. Department of Veterans Affairs. The U.S. Department of Veteran's Affairs is an administrative agency of the United States government which runs programs benefiting veterans and members of their families including providing education and rehabilitation services, compensation payments, home loan guaranties, pensions, burials, and health care. The U.S. Department of Veterans Affairs is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII") and Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791, 29 C.F.R. § 1614.203(c), 29 C.F.R. § 1630.9(a), Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, under which Plaintiff brings her claims.

## FACTUAL ALLEGATIONS

6.      Dytaun Montgomery, an African American woman, was employed at the Human Resources Department of the U.S. Department of Veterans Affairs, Medical Center, located at 50 Irving Street, N.W., Washington D.C. 20422. Ms. Montgomery began employment on December 13, 2015, initially as a GS-7 Human Resources Specialist. Ms. Montgomery's job duties included facilitating orientation for new hires, processing market pays for physicians, processing various personnel actions, position management, completing preemployment process, and other duties as assigned. During the relevant period, Ms. Montgomery's first level supervisor was Human Resources Supervisor Cheryl Williams (African American). Ms. Montgomery's second level supervisor was Chief Human Resources Officer Shannon Carrol (African American).

7.      Ms. Montgomery has been diagnosed with permanent severe hearing loss in her left ear, which limits her ability to hear. Ms. Montgomery, if she experiences a vertigo episode, must also take her prescribed medication, meclizine, which affects her ability to function in a normal capacity. Management of the Agency knew of and understood that Ms. Montgomery has a hearing disability, evidenced by her Human Resources "Smart Record" which states "hard of hearing" on her employee record; the hiring authority used to appointment Ms. Montgomery to her current and previous position(s); and her peers asking Ms. Montgomery which was her "good or bad ear" when speaking to her in front of Agency management. Ms. Montgomery also provided management with documentation regarding her disability when she applied for her position, when she attached her Schedule A letter.

8.      On an unspecified date in 2018, Taneshia Horton, Chief Human Resources, (African American) indicated that Ms. Montgomery's Schedule A letter was not signed by a

3

certified physician. Ms. Montgomery submitted a FOIA request in response, but never received response from Ms. Facemire. Ms. Montgomery also told Shannon Carrol about this incident. Ms. Montgomery was made to reapply for a position that she already held and was fully successful at.

9.      On April 24, 2018, Ms. Montgomery and other Human Resources staff stood up in the VA's Town Hall Meeting to address the hostile work environment Agency employees had encountered since Lisa Wilson became the HRO. The following Tuesday, May 1, 2018, the majority of Human Resources staff met with Dr. Adam Robinson, Mr. John Eckman, and an EEO representative who had come from Baltimore, Maryland to address the issues/concerns that Agency employees had regarding Lisa Wilson and the hostile work environment she created. The following Friday, May 4, 2018, Lisa Wilson was removed from the Medical Center and placed at the VISN under Charlene McCollum (VISN 5 HRO).

10.     On June 7, 2018, Ms. Montgomery, Shavonne Taylor, Lashawna Norman were called to a private meeting with Charlene McCollum and Anthony Romano who served as a consultant for a period of 30 to 60 days. Ms. Montgomery, Ms. Taylor, and Ms. Norman were informed by Ms. McCollum that one of their colleagues had filed a complaint. Ms. McCollum spoke with Debbie Kolen at the Recruitment, Placement and Policy office who told her to regularize the situation by handling it in house and that her not doing so would escalate the complaint to an outside source. Ms. Montgomery, Ms. Taylor, and Ms. Norman did want the issue to go that far. Ms. McCollum then stated that leadership in the front office were aware of her decision, and she could move forward. Ms. McCollum further informed Ms. Montgomery, Ms. Taylor, and Ms. Norman that the appointment was announced incorrectly, and that they had to reapply. Ms. McCollum told Ms. Montgomery, Ms. Taylor, and Ms. Norman that someone from

her office was going to re-announce the position, no other staff would know about it, and that she would let them know when it was time for them to reapply.

11.     On or around September 1, 2018, Ms. Montgomery learned from two other employees, that Ms. Horton said employees with disabilities who were hired under the Schedule A Hiring Authority should be terminated. Ms. Horton stated that Schedule A employees should be terminated and should have never been hired in Human Resources. Ms. Montgomery discussed this incident with Ms. Shannon Carrol, and Ms. Carrol told Ms. Montgomery that she told Ms. Horton to show her in the policy. This conversation took place in Ms. Carrol's office.

12.     On September 17, 2018 at approximately 4:40 p.m., Ms. Montgomery returned to the office from facilitating orientation. Shavonne Taylor and Lashawna Norman had met with the Deputy HRO Ms. Horton. Ms. Montgomery said to Ms. Taylor, "I wonder why I was not included in that meeting, since I was one of the ones, that was involved in the issue with regularizing the position we currently hold." Ms. Taylor indicated that Ms. Horton stated that she was an "expert" on schedule A and staffing and recruitment, and that she was working on their case sometime in January. Ms. Horton told Ms. Taylor that it was coming back to her. In an attempt to "regularize" the appointment, Ms. Horton planned to use Ms. Taylor's master's degree to bring her on staff as a level GS-9 and other employees had to reapply for the position or face termination. Ms. Horton asked Ms. Taylor to print her 50's and Ms. Taylor provided them to her at approximately 4:15 p.m. Ms. Taylor further informed Ms. Horton that Ms. Montgomery was the other employee involved.

13.     On October 2, 2018, during a conversation with Cheryl Williams, Ms. Williams yelled at Ms. Montgomery and said she was tired of employees telling her she was not doing her

job, and during the same conversation, Ms. Williams also said Ms. Montgomery could not hear. At around 6:35 p.m., a payroll technician told Ms. Montgomery that she almost did not get paid and that she only saw 1.30 hours of Ms. Montgomery's overtime. Ms. Montgomery went into Ms. Williams' office to inquire about her overtime and Ms. Williams, at the time, was on the phone with Stacy McCrea who was in the IT Department. Ms. Williams stated that she processed Ms. Montgomery's time and said she should not have to walk around and make sure people enter their time. Ms. Williams then told Ms. Montgomery to see the timekeeper, Ms. McCrea. Ms. Montgomery told Ms. Williams that this did not make sense since she had given Ms. Williams her overtime sheets the week prior. Ms. Williams then said to Ms. Montgomery that she did her job, and she was tired of people saying that she did not. Ms. Williams also asked Ms. Montgomery why she came back to her office after she told Ms. Montgomery to speak with Ms. McCrea. Ms. Montgomery replied that she had questions, and Ms. Williams began to speak loudly toward Ms. Montgomery.

14.     Ms. Montgomery asked Ms. Williams not to "take it out" on her, and Ms. Williams then tried to place the blame on Ms. Montgomery. Warren Foster had also shut the door because Ms. Williams had gotten louder when speaking to Ms. Montgomery. Mr. Foster shortly returned and asked Ms. Montgomery, "Is this your bad ear" and indicated Ms. Montgomery's left side, and Ms. Montgomery confirmed. Ms. Williams then said, "Yeah, she can't hear." Ms. Montgomery, in response, asked Ms. Williams "What you are saying? Don't try and blame this on my disability." Ms. Montgomery further asked her "Are you discriminating against my disability" and Ms. Williams, in response, said that she did not say that, even after Ms. Montgomery repeated to her what she had said. Ms. Williams ultimately told Ms. Montgomery to get out of her office.

15.     After this incident, Ms. Horton asked Ms. Montgomery to come into her office and asked her about the situation because she was on a call and could hear them. Ms. Montgomery told Ms. Horton that Ms. Williams became upset with her when she asked about her overtime. Ms. Montgomery explained the incident to Ms. Horton and Ms. Horton asked her if she had a disability and Ms. Montgomery confirmed her disability. Ms. Montgomery then spoke with Ms. Horton about respect in the workplace and Ms. Montgomery indicated that she did not want to go into detail because she had previously discussed the issue with Ms. Carrol, and she would have to share that information with her. Ms. Montgomery told Ms. Carrol that she did not want to work under Ms. Williams when the new supervisor come on board. Ms. Montgomery was never disrespectful to Ms. Williams.

16.     When Ms. McCrea returned, Ms. Montgomery went to her and inquired about her overtime. Ms. McCrea said she also had heard Ms. Williams and Ms. Montgomery on the phone. Ms. McCrea told Ms. Montgomery that a supervisor needed to sign the overtime sheets timely, not after time sheets are certified, and then expect the overtime to show up. Ms. McCrea explained to Ms. Montgomery that her overtime was processed but on a corrected timesheet and that it might not show up for the pay period.

17.     Ms. Montgomery discussed this incident with Ms. Horton and did not know the outcome, if any. Ms. Montgomery felt uncomfortable speaking with Ms. Horton knowing that she was involved with Ms. Montgomery's promotion/the fact finding prior to her coming onboard.

18.     On December 12, 2018, after a Tiger Team meeting, Ms. Horton told Ms. Montgomery to meet her in her office and during the meeting, Ms. Horton stated that Ms. Montgomery had inappropriately challenged her authority in front of other employees.

19.    On December 12, 2018, a staff meeting was held and ran by Ms. Horton and a "Tiger Team" was created in which Ms. Montgomery was a part of. During the meeting, Ms. Horton stated that after staff completed an audit of information and created forms and uploaded them, she and Randy Lord would review and distribute them to staffers to correct the actions. Danika Parker asked, "Is the tiger team going to complete the task from beginning to end?", and Ms. Horton responded, "Yes." Ms. Montgomery then said, "That's not what I heard from you in our meeting, but that is fine" and did not indicate that staff were not going to complete the task. Ms. Horton then said that she did not say that, and that what she said was they would be correcting any corrections for the services in which they were assigned. Ms. Montgomery repeated that that was not what she had previously heard and asked, "Could we discuss this offline?" Ms. Horton responded, "No, I'm going to address it right now."

20.    Toward the end of the December 12, 2018 meeting, when Sade Vaughn was addressing one of her concerns, Ms. Carrol walked in and asked what was going on and what was wrong. Ms. Horton asked Ms. Carrol for clarification as to who would be correcting the actions, if any corrections needed to be made. Ms. Carrol confirmed that the staffers on the "Tiger team" would be correcting the actions.

21.    As staff began to leave the meeting, Ms. Horton asked Ms. Montgomery to see her in her office. Ms. Montgomery went into her office and Ms. Horton told her that she felt that Ms. Montgomery's approach was "challenging her", and that this was the second time Ms. Montgomery had challenged her in front of company. Ms. Montgomery affirmed that she previously heard a different task was assigned and Ms. Horton responded that no person who reports to her should challenge her in a meeting or in front of company. Ms. Horton said to Ms.

Montgomery, "You have to be tactful and that is ghetto." After a continued back and forth between Ms. Horton and Ms. Montgomery, Ms. Montgomery told Ms. Horton that she had stated her issue, apologized to her, and asked her how she would like Ms. Montgomery to handle these situations going forward. Ms. Horton began the back and forth again and Ms. Montgomery interrupted her and suggested to have Ms. Carrol involved because she did not want to continue the back and forth and Ms. Horton changed the subject. Ms. Montgomery told her from that point on, she will not say anything. Ms. Horton said "No, I don't want you to do that." Finally, Ms. Montgomery walked out of her office.

22.    In January 2019, Ms. Montgomery was required to reapply and compete for the same job she had held for over a year and a half. On March 1, 2019, Ms. Montgomery was offered the job, however, she was not credited with the year and eight months she had already worked in the position. Ms. Montgomery had a meeting with Shannon Carrol, Christopher Irwin, and two other employees that were going through the similar issue. Ms. Montgomery also discussed the incident via email Mr. Heimall and Mr. Walton. Ms. Montgomery had to reapply for the position in the beginning of March 2019 that was reposted by VISN Leadership. Ms. Wilson Davis stated that to Jader Rivas, that Ms. Montgomery and the other employees were told that if they did not apply, they would be terminated. Then, in an email, it was stated that Ms. Montgomery and the other employees would be placed back to assistant positions. Ms. Montgomery never received an official Offer Letter. VISN leadership also deleted SF50's out of Ms. Montgomery's OPF file based on Ms. McCollum stating that Ms. Montgomery sat in an erroneous appointment. Ms. McCollum did not follow VA Handbook 5005/65, Part I, Appendix C, Regularizing Erroneous Title 5 Appointments.

23.    As of March 5, 2019, Ms. Montgomery had not received a FY 2017 performance appraisal or promotion to the GS-09 level. Ms. Montgomery discussed this issue with Shannon Carrol, and at the time Rachel Evans who was detailed here from Tampa Florida. On August 27, 2018, Ms. Montgomery spoke with Brandon Coleman, and she told him how Ms. Williams used a previous performance appraisal that was completed by a previous supervisor. Mr. Coleman asked if Ms. Montgomery received a copy and Ms. Montgomery indicated that she did not. When Ms. Williams called Ms. Montgomery to discuss the issue, Ms. Williams told Ms. Montgomery that she was using the performance appraisal completed by Ms. Jerry. Ms. Montgomery asked her how she could use that appraisal when Ms. Williams did not rate Ms. Montgomery herself. Ms. Montgomery did not sign the appraisal because Ms. Williams did not rate Ms. Montgomery. Ms. Williams said, "Okay, I will say employee refused to sign." and Ms. Montgomery walked out.

24.    Later, Ms. Montgomery told Rachel Evans that her performance appraisal was never completed for Fiscal Year ("FY") 2017. Ms. Montgomery printed a blank performance appraisal that was in her EOPF. Ms. Evans had Danika Parker check to see if Ms. Montgomery received a performance appraisal for FY 2017, and Ms. Parker sent a remedy ticket to DFAS inquiring about her FY 2017.

25.    On September 27, 2018, Ms. Parker came over with a printout for FY 2016. Ms. Montgomery asked Ms. Evans if she was going to receive her award for 2017 and Ms. Evans responded that she had received a list for those in Human Resources that did not get one. Ms. Evans walked to her desk and returned with a performance appraisal in her hand and Ms. Montgomery asked where it originated and asked for a copy. Ms. Montgomery told her that Ms. Williams had forged everything on the appraisal and that she copied some of the pages from the

previous year. Ms. Montgomery asked Ms. Evans to compare the 2018 appraisal with the 2016 appraisal that Ms. Montgomery had prepared, and it contained the same information, Grade GS-6. Ms. Montgomery later explained the issue to Ms. Caroll and she indicated she would address the issue. Ms. Williams signed Ms. Montgomery's 0750 July 31, 2018.

26.    Throughout her employment with the Agency, Ms. Montgomery engaged in protected EEO activities, including but not limited to activity on or around April 24, 2018; June 7, 2018; September 17, 2018; and December 7, 2018 when she filed a complaint with Whistleblower ("OAWP").

27.    Ms. Montgomery had not received a performance appraisal. Ms. Montgomery later received a delayed promotion to the GS-09 level at a time after she was required to receive a promotion. In 2021, Ms. Montgomery took medical leave from the Agency and has since left employment with the Agency.

28.    On March 18, 2019, Ms. Montgomery filed a formal EEO complaint of discrimination with the Agency and the Agency investigated her claims and issued a Report of Investigation. Following the Agency's investigation, Ms. Montgomery requested a hearing before the U.S. Equal Employment Opportunity Commission, Washington Field Office, and her complaint was assigned to an Administrative Judge Nicole Valentine. Following the Administrative Judge's March 14, 2022 decision finding in favor of the Agency, the Agency issued a Final Agency Decision in this matter on March 16, 2022 and advised Plaintiff of her right to file a complaint in court within 90 days of receipt of the Final Agency Decision. Plaintiff has exhausted all administrative remedies, and her complaint is being filed in court this June 14, 2022, within 90 days of receipt of the March 16, 2022 Final Agency Decision.

## COUNT I
### Violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII")
### 42 U.S.C. § 2000e *et seq.*
### Race and Color Discrimination
### Disparate Treatment and Hostile Work Environment

29.     Plaintiff realleges and incorporates by reference each of the allegations the above paragraphs as if fully stated herein.

30.     At all pertinent times, the Defendant was an employer subject to provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

31.     At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

32.     Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race and/or color. A hostile work environment is a form of prohibited employment discrimination where the employee is subjected to a work environment permeated with hostility and humiliation that substantially alters the work environment.

33.     A hostile work environment is a form of prohibited employment discrimination where the employee is subjected to a work environment permeated with ridicule and humiliation that substantially alters the work environment. However, a single use of a "deeply offensive racial epithet ... might well ... be [] sufficient to establish a hostile work environment." *Ayissi–Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013). *See also Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) ("...an isolated incident of harassment can amount to

discriminatory changes in the terms and conditions of employment, if that incident is extremely serious.") (internal citations omitted). In addition, a "supervisor's use of a racial epithet impacts the work environment far more severely than use by co-equals." *Boyer-Liberto*, 786 F.3d at 278. *See also Rodgers v. W.–S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993), *and Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("a supervisor's power and authority invests his or her harassing conduct with a particular threatening character.").  The use of "monkey" to refer to an African American employee "is about as odious as the use of the word 'nigger.'"  *Boyer-Liberto*, 786 F.3d at 280.  *See also Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) ("describing an African–American as a 'monkey,' and thereby 'suggest [ing] that a human being's physical appearance is essentially a caricature of a jungle beast[,] goes far beyond the merely unflattering; it is degrading and humiliating in the extreme.'"); *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 911 (8th Cir. 2006) (recognizing that "[p]rimate rhetoric has been used to intimidate African–Americans" and that "[t]he use of the term 'monkey' and other similar words," including the variation "porch monkey," has "been part of actionable racial harassment claims across the country") (internal citations omitted).

34.    In violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e *et seq*., Defendant knowingly and intentionally subjected Plaintiff to disparate treatment and a hostile work environment based on her race and color when: on an unspecified date in 2018, Taneshia Horton, Acting Chief Human Resources, indicated Plaintiff's Schedule A letter was not signed by a certified physician; on or around September 1, 2018, Plaintiff learned from two other employees that Ms. Horton said employees with disabilities who were hired under the Schedule A Hiring Authority should be terminated; on October 2, 2018, during a conversation with Cheryl Williams,

Human Resources Specialist, Ms. Williams yelled at Plaintiff and said she was tired of employees telling her she was not doing her job and during the same conversation, Ms. Williams also said Plaintiff could not hear; on December 12, 2018, after a Tiger Team meeting, Ms. Horton told Plaintiff to meet her in her office and during the meeting, Ms. Horton stated Plaintiff had inappropriately challenged her authority in front of other employees; in January 2019, Plaintiff was required to reapply and compete for the same job she has held for over a year and a half and on March 1, 2019, she was offered the job, however, she was not credited with the year and eight months she had already worked in the position; and as of March 5, 2019, Plaintiff had not received a FY 2017 performance appraisal and later received a delayed promotion to the GS-09 level at a time after she was required to receive a promotion.

35.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages, emotional distress, and pain and suffering.

36.    Defendant had no legitimate business reason for any such acts.

37.    Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

## **COUNT II**
**Violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII")**
**42 U.S.C. § 2000e *et seq.***
**Sex Discrimination**
**Disparate Treatment and Hostile Work Environment**

38.    Plaintiff realleges and incorporates by reference each of the allegations the above paragraphs as if fully stated herein.

39.    At all pertinent times, the Defendant was an employer subject to provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

40.    At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

41.    Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's sex. A hostile work environment is a form of prohibited employment discrimination where the employee is subjected to a work environment permeated with hostility and humiliation that substantially alters the work environment.

42.    In violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e *et seq*., Defendant knowingly and intentionally subjected Plaintiff to disparate treatment and a hostile work environment based on her sex when: on an unspecified date in 2018, Taneshia Horton, Acting Chief Human Resources, indicated Plaintiff's Schedule A letter was not signed by a certified physician; on or around September 1, 2018, Plaintiff learned from two other employees that Ms. Horton said employees with disabilities who were hired under the Schedule A Hiring Authority should be terminated; on October 2, 2018, during a conversation with Cheryl Williams, Human Resources Specialist, Ms. Williams yelled at Plaintiff and said she was tired of employees telling her she was not doing her job and during the same conversation, Ms. Williams also said Plaintiff could not hear; on December 12, 2018, after a Tiger Team meeting, Ms. Horton told Plaintiff to meet her in her office and during the meeting, Ms. Horton stated Plaintiff had inappropriately challenged her authority in front of other employees; in January 2019, Plaintiff was required to

reapply and compete for the same job she has held for over a year and a half and on March 1, 2019, she was offered the job, however, she was not credited with the year and eight months she had already worked in the position; and as of March 5, 2019, Plaintiff had not received a FY 2017 performance appraisal and later received a delayed promotion to the GS-09 level at a time after she was required to receive a promotion.

43.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages, emotional distress, and pain and suffering.

44.     Defendant had no legitimate business reason for any such acts.

45.     Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

### COUNT III
**Violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII")**
**42 U.S.C. § 2000e *et seq.***
**Hostile Work Environment based on Retaliation/Reprisal**

46.     Plaintiff realleges and incorporates by reference each of the allegations the above paragraphs as if fully stated herein.

47.     At all pertinent times, the Defendant was an employer subject to provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

48.     At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

49.     Title VII of the Civil Rights Act of 1964 states that it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individuals, or otherwise to discriminate against any individuals with respect to her compensation, terms, conditions, or

privileges of employment because of such individuals race, sex, and/or color, and it is unlawful to retaliate against an employee because she engages in protected activity.

50.    Plaintiff engaged in protected EEO activities, including but not limited to activity on or around April 24, 2018; June 7, 2018; September 17, 2018; and December 7, 2018 when she filed a complaint with Whistleblower ("OAWP").

51.    In violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e *et seq*., Defendant knowingly and intentionally subjected Plaintiff to a hostile work environment based on retaliation/reprisal, including *per se* retaliation, for engaging in  protected EEO activities including but not limited to activity on or around April 24, 2018; June 7, 2018; September 17, 2018; and December 7, 2018 when she filed a complaint with Whistleblower ("OAWP") when: on an unspecified date in 2018, Taneshia Horton, Acting Chief Human Resources, indicated Plaintiff's Schedule A letter was not signed by a certified physician; on or around September 1, 2018, Plaintiff learned from two other employees that Ms. Horton said employees with disabilities who were hired under the Schedule A Hiring Authority should be terminated; on October 2, 2018, during a conversation with Cheryl Williams, Human Resources Specialist, Ms. Williams yelled at Plaintiff and said she was tired of employees telling her she was not doing her job and during the same conversation, Ms. Williams also said Plaintiff could not hear; on December 12, 2018, after a Tiger Team meeting, Ms. Horton told Plaintiff to meet her in her office and during the meeting, Ms. Horton stated Plaintiff had inappropriately challenged her authority in front of other employees; in January 2019, Plaintiff was required to reapply and compete for the same job she has held for over a year and a half and on March 1, 2019, she was offered the job, however, she was not credited with the year and eight months she had already worked in the position; and as of March 5, 2019,

17

Plaintiff had not received a FY 2017 performance appraisal and later received a delayed promotion to the GS-09 level at a time after she was required to receive a promotion.

52.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages, emotional distress, and pain and suffering.

53.     Defendant had no legitimate business reason for any such acts.

54.     Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

**COUNT IV**
**Violation of Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791**
**29 C.F.R. § 1614.203(c)**
**29 C.F.R. § 1630.9(a)**
**Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111**
**Disability Discrimination**

55.     Plaintiff realleges and incorporates by reference each of the allegations in the above paragraphs as if fully stated herein.

56.     At all pertinent times, the Defendant was an employer subject to provisions of Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791, 29 C.F.R. § 1614.203(c), 29 C.F.R. § 1630.9(a), Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111.

57.     At all pertinent times, Plaintiff was an employee entitled to protection under Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791, 29 C.F.R. § 1614.203(c), 29 C.F.R. § 1630.9(a), Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111.

58.     Section 501 of the Rehabilitation Act prohibits federal executive branch agencies from discriminating against qualified individuals with disabilities and requires executive branch agencies to take affirmative action in the hiring, placing, and advancing of individuals with

disabilities, and requires interpretation consistent with the Americans with Disabilities Act. 29 C.F.R. Section 1630.9(a) makes it unlawful for a covered entity not to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business. 29 C.F.R. § 1614.203(c) further requires that the federal government be a "model employer" of individuals with disabilities.

59.    Defendant engaged in illegal disability discrimination, as defined by the Rehabilitation Act, including without limitation when: on an unspecified date in 2018, Taneshia Horton, Acting Chief Human Resources, indicated Plaintiff's Schedule A letter was not signed by a certified physician; on or around September 1, 2018, Plaintiff learned from two other employees that Ms. Horton said employees with disabilities who were hired under the Schedule A Hiring Authority should be terminated; on October 2, 2018, during a conversation with Cheryl Williams, Human Resources Specialist, Ms. Williams yelled at Plaintiff and said she was tired of employees telling her she was not doing her job and during the same conversation, Ms. Williams also said Plaintiff could not hear; on December 12, 2018, after a Tiger Team meeting, Ms. Horton told Plaintiff to meet her in her office and during the meeting, Ms. Horton stated Plaintiff had inappropriately challenged her authority in front of other employees; in January 2019, Plaintiff was required to reapply and compete for the same job she has held for over a year and a half and on March 1, 2019, she was offered the job, however, she was not credited with the year and eight months she had already worked in the position; and as of March 5, 2019, Plaintiff had not received a FY 2017 performance appraisal and later received a delayed promotion to the GS-09 level at a time after she was required to receive a promotion.

60.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages, emotional distress, and pain and suffering.

61.     Defendant had no legitimate business reason for any such acts.

62.     Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

## **PRAYER FOR RELIEF**

WHEREFORE and for the foregoing reasons, Plaintiff Montgomery respectfully prays as follows:

A.     That the Court issue a declaratory judgment that Defendant's practices toward Plaintiff were violative of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. and Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791, 29 C.F.R. § 1614.203(c), 29 C.F.R. § 1630.9(a), Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, and declaring Plaintiff eligible to receive equitable and other relief;

B.     Enjoin Defendant from discriminating against employees based on their race;

C.     Issue a permanent injection prohibit Defendant from engaging in any further acts of discrimination, harassment, and retaliation;

D.     Order Defendant to refrain from any action Plaintiff, or any other person, for participating in or support this case in any manner;

E.     Award Plaintiff all available damages, including compensatory damages for emotional distress and hardship created by the Defendant's discrimination;

F.    Award payment of all fees, costs, expenses, including attorneys' fees and expert fees; and

G.    Award Plaintiff such other relief as to which she may be deemed entitled.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues that are triable by jury.

Date: June 14, 2022                                    Respectfully submitted,

                                    ___/s/ David A. Branch___
                                    David A. Branch
                                    D.C. Bar No. 438764
                                    The Law Office of David A. Branch &
                                    Associates, PLLC
                                    1828 L Street, N.W., Suite 820
                                    Washington, D.C. 20036
                                    Phone: (202) 785-2805
                                    Fax: (202) 785-0289
                                    Email: davidbranch@dbranchlaw.com