### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| DYTAUN MONTGOMERY, | : | | |
| | : | | |
| *Plaintiff,* | : | | |
| | : | | |
| v. | : | Civil Action No.: | 22-1715 (RC) |
| | : | | |
| DENIS MCDONOUGH, | : | Re Document No.: | 10 |
| Secretary of Veterans Affairs | : | | |
| | : | | |
| *Defendant.* | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION TO DISMISS

## I.  INTRODUCTION

Plaintiff Dytaun Montgomery brings this employment discrimination action against Denis McDonough in his official capacity as Secretary of Veterans Affairs.  The Secretary moves to dismiss under Rule 12(b)(6) for failure to state a claim.  For the reasons set forth below, the Court GRANTS the Secretary's motion to dismiss.

## II.  FACTUAL BACKGROUND

Dytaun J. Montgomery is an African-American woman with permanent severe hearing loss in her left ear.[1]  Compl. ¶¶ 4–7, ECF No. 1.  Ms. Montgomery also sometimes experiences vertigo episodes and must take her prescribed medication, meclizine, "which affects her ability

---

[1] The factual narrative in the complaint is at times unclear, but the Court makes its best attempt to distill the allegations.  As required at the motion to dismiss stage, all allegations are assumed as true.  *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).

to function in a normal capacity."[2]  *Id.*  ¶ 7.  In 2015, Ms. Montgomery started as a GS-07 "Human Resources Specialist" at the United States Department of Veterans Affairs Medical Center.  *Id.* ¶ 6.  Ms. Montgomery was hired through Schedule A, a special hiring authority that federal agencies may use to hire individuals with disabilities instead of going through the standard hiring process.[3]  *Id.* ¶ 7.  Ms. Montgomery's job duties included "facilitating orientation for new hires, processing market pays for physicians, processing various personnel actions, position management, completing preemployment process, and other duties as assigned."  *Id.* ¶ 6. During the "relevant period," Ms. Montgomery's "first level supervisor was Human Resources Supervisor Cheryl Williams," and her "second level supervisor was Chief Human Resources Officer Shannon Carrol."  *Id.*  Ms. Montgomery also worked with Ms. Taneshia Horton, whose title is given as "Chief Human Resources" although it is unclear whether Ms. Horton was more or less senior than Ms. Carrol.  *Id.* ¶ 8.  Ms. Williams, Ms. Carrol and Ms. Horton are all African-American women.  *Id.* ¶¶ 6, 8.

As part of her hiring process, Ms. Montgomery produced a Schedule A letter documenting her hearing loss.  *Id.*  ¶ 7.  In 2018, "on an unspecified date," Ms. Horton, the Chief of Human Resources, "indicated that Ms. Montgomery's Schedule A letter was not signed by a certified physician."  *Id.* ¶ 8.  Ms. Montgomery submitted a FOIA request regarding Ms. Horton's claim but never received a response.  *Id.*  She also told Ms. Carrol about Ms. Horton's statement.  *Id.*  Ms. Montgomery does not elaborate on the Schedule A letter and does not state whether she believes Ms. Horton was incorrect, whether she provided a revised Schedule A

---

[2] Aside from introducing this condition early on, the complaint makes no further reference to Ms. Montgomery's vertigo or side effects from meclizine.

[3] *See* 5 CFR § 213.3102.

letter, or whether this incident influenced any of the other events described later in the complaint.[4]

On April 24, 2018, Ms. Montgomery and other Human Resources staff spoke out at a department town hall meeting to address a hostile work environment perpetuated by the head of Human Resources at the Medical Center.  *Id.* ¶ 9.  Shortly thereafter, that Human Resources head official was reassigned to a different position outside of the Medical Center.  *Id.*  The complaint does not in any way describe the nature of the hostile work environment and does not provide allegations linking this situation to following events.

After those initial episodes, Ms. Montgomery's core narrative begins during the summer of 2018.  *Id.* ¶ 10.  On June 7, 2018, Ms. Montgomery and two other disabled coworkers hired under Schedule A were called into a meeting with Ms. Charlene McCollum, a Human Rights Officer with the Department's Veterans Integrated Services Network.  *Id.*  Ms. McCollum informed Ms. Montgomery and her two disabled coworkers that their appointments to their current roles had been announced incorrectly and that they would have to reapply to their positions to "regularize the situation."  *Id.*  They were also informed that "one of their colleagues had filed a complaint" presumably related to this hiring irregularity.  *Id.*  Ms. McCollum told Ms. Montgomery, Ms. Taylor, and Ms. Norman that she would let them know when it was time to reapply.  *Id.*

On or around September 1, 2018, Ms. Montgomery learned "from two other employees" that Ms. Horton had said that employees with disabilities who were hired under the Schedule A Hiring Authority should be terminated and should have never been hired in Human Resources.

---

[4] While the complaint adds in this paragraph that "Ms. Montgomery was made to reapply for a position that she already held and was fully successful at," this statement appears to instead refer to the events described later in this section.  Compl. ¶ 8.

*Id.* ¶ 11.  On September 17, 2018, Ms. Montgomery was excluded from a meeting with Ms.

Horton and the other two Schedule A hires and openly inquired as to the reason.  *Id.* ¶ 12 ("I

wonder why I was not included in that meeting, since I was one of the ones, [sic] that was

involved in the issue with regularizing the position we currently hold.").  Ms. Montgomery later

learned that at that meeting, Ms. Horton said she was an "expert" on Schedule A and staffing,

and that she had a plan to "regularize" the positions "sometime in January."  *Id.*  While Ms.

Horton intended to use one Schedule A employee's master's degree to regularize her role, she

planned to require Ms. Montgomery and another employee to reapply for their positions or be

terminated.  *Id.*

Around the same time period in summer 2018, Ms. Montgomery found out that her

supervisor, Ms. Williams, was basing Ms. Montgomery's performance appraisal for fiscal year

2017 on a prior year's appraisal.  *Id.* ¶ 23.  Ms. Montgomery refused to sign that appraisal

because it was taken from a previous appraisal completed by another supervisor, meaning that

Ms. Williams did not rate Ms. Montgomery herself.  *Id.*  Later, Ms. Montgomery noted that her

appraisal was therefore never completed for fiscal year 2017 and asked whether she would

receive the related cash award for 2017.[5]  *Id.* ¶ 24–25.  Ms. Montgomery apparently was on a list

of employees who did not receive an award.  *Id.* ¶ 25.  After requesting her appraisal for 2017,

Ms. Montgomery was shown an appraisal that was merely a copy from the previous year.  *Id.*

Ms. Montgomery believed that Ms. Williams had forged the information on this appraisal and

---

[5] *Approaches to Calculating Performance-Based Cash Awards*, Office of Personnel
Management, https://www.opm.gov/policy-data-oversight/performance-
management/performance-management-cycle/rewarding/approaches-to-calculating-performance-
based-cash-awards/ (last accessed June 21, 2023) ("A performance-based cash award (commonly
known as a rating-based award) recognizes an employee's performance over an entire rating
period.")

asked another employee to compare the appraisal with her 2016 appraisal.  *Id.*  The appraisals contained the same information.  *Id.*  Ms. Montgomery later explained her performance appraisal issue to Ms. Carrol who "indicated she would address the issue."  *Id.*  Much later, by March 2019, Ms. Montgomery still had not received her fiscal year 2017 performance appraisal.  *Id.* ¶ 23.

In October 2018, Ms. Montgomery had a contentious verbal dispute with Ms. Williams about timekeeping practices and overtime pay.  *Id.* ¶ 13.  During that quarrel, "Ms. Williams yelled at Ms. Montgomery and said she was tired of employees telling her she was not doing her job."  *Id.*  As the conversation grew more heated, another co-worker asked Ms. Montgomery if her left ear was her "bad ear," and Ms. Montgomery confirmed her hearing loss in that ear.  Ms. Williams added "[y]eah, she can't hear."  *Id.* ¶ 14.  Following this remark, Ms. Montgomery said to Ms. Williams "[d]on't try and blame this on my disability" before further asking "[a]re you discriminating against my disability?"  *Id.*  Ms. Williams denied making the "she can't hear" comment, Ms. Montgomery repeated the initial comment back to her, and Ms. Williams "ultimately told Ms. Montgomery to get out of her office."  *Id.*

Ms. Montgomery then discussed the situation with Ms. Horton but felt uncomfortable because she knew that Ms. Horton was involved in her hiring and in promotion decisions.  *Id.* ¶ 15–17.  Ms. Horton asked Ms. Montgomery if she had a disability, which Ms. Montgomery confirmed.  *Id.* ¶ 15.  Ms. Montgomery spoke with Ms. Horton "about respect in the workplace" and "Ms. Montgomery indicated that she did not want to go into detail because she had previously discussed the issue with Ms. Carrol, and she would have to share that information with her."  *Id.*  Ms. Montgomery also expressed her desire to no longer work under Ms. Williams.  *Id.*  Ms. Montgomery did not know the outcome of this conversation.  *Id.* ¶ 17.

On December 7, 2018, Ms. Montgomery filed a complaint with the Department of Veterans Affairs' Office of Accountability and Whistleblower Protection ("OAWP"), although there are no details about the contents of this complaint. *Id.* ¶ 26.

Thereafter, on December 12, 2018, Ms. Horton held a staff meeting where she created a "Tiger Team" of employees that would conduct a series of audits. *Id.* ¶ 18. When one employee asked Ms. Horton if the Tiger Team would complete this task from beginning to end, and Ms. Horton answered yes, Ms. Montgomery spoke up and stated that she had heard differently from Ms. Horton in a previous meeting. *Id.* ¶ 19. At the end of the meeting, Ms. Horton called Ms. Montgomery into her office to say that Ms. Montgomery should not challenge her in a meeting in front of other company. *Id.* ¶ 21. Ms. Horton chided that "[y]ou have to be tactful and that is ghetto." *Id.* A back-and-forth began where Ms. Montgomery apologized to Ms. Horton, the dispute continued, and Ms. Montgomery eventually walked out of Ms. Horton's office. *Id.*

In January 2019, as she had been told about several months prior, Ms. Montgomery was required to reapply for the job she had held for over a year and a half.[6] *Id.* ¶ 22. On March 1, 2019, Ms. Montgomery "was offered the job, however, she was not credited with the year and eight months she had already worked in the position." *Id.* By March 5, 2019, she had not been promoted to the GS-09 level despite having sufficient experience. *Id.* ¶ 23. Veterans Affairs leadership also deleted SF50's out of Ms. Montgomery's personnel file based on Ms. McCollum stating that Ms. Montgomery sat in an erroneous appointment.[7] *Id.* ¶ 22. The crux of these

---

[6] Ms. Montgomery was originally hired in 2015, so it is unclear how the complaint arrives at this timeline of a year and a half of experience in her role by January 2019. Reading between the lines of the complaint, it appears that Ms. Montgomery received an unmentioned promotion in 2017.

[7] An SF-50 is a federal employment form describing various personnel actions.

allegations is that the Department "did not follow VA Handbook 5005/65, Part I, Appendix C, Regularizing Erroneous Title 5 Appointments." *Id.*

Ms. Montgomery ultimately retained her position and "later received a delayed promotion to the GS-09 level at a time after she was required to receive a promotion." *Id.* ¶ 27. In 2021, Ms. Montgomery took medical leave and has since left employment with the Department of Veterans Affairs. *Id.*

This lawsuit is not the beginning of Ms. Montgomery's efforts to press her employment claims. On March 18, 2019, Ms. Montgomery filed a formal EEO complaint with the Department of Veterans Affairs. *Id.* ¶ 28. She requested a hearing before the Equal Employment Opportunity Commission, which found in favor of the Department. *Id.* The Department issued a final decision on March 16, 2022. *Id.* With no luck through administrative remedies, Ms. Montgomery brought this action on June 14, 2022. *Id.* The Secretary has now moved to dismiss Ms. Montgomery's claims.

### III. LEGAL STANDARD

A plaintiff must provide a "short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (citation omitted). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint" by asking whether the plaintiff has properly stated a claim for which relief can be granted. *Browning v. Clinton,* 292 F.3d 235, 242 (D.C. Cir. 2002). In considering such a motion, the complaint must be construed "liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged." *Stewart v. Nat'l*

*Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *Twombly*, 550 U.S. at 555, "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2006) (internal quotation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a motion to dismiss. *Id*. Similarly, there is no obligation to accept plaintiff's legal conclusions as true, nor to presume the truth of legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555.

For employment discrimination suits, a "plaintiff is not required to plead every fact necessary to establish a *prima facie* case to survive a motion to dismiss." *Jones v. Air Line Pilots Ass'n, Intern*, 642 F.3d 1100, 1104 (D.C. Cir. 2011) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)). Similarly, the plaintiff does not need to "anticipate legitimate, non-discriminatory reasons that may be proffered by the employer for the adverse employment action nor allege pretext to survive a motion to dismiss." *Townsend v. United States*, 236 F. Supp. 3d 280, 298 (D.D.C. 2017) (citing *Swierkiewicz*, 534 U.S. at 511, 515).

Yet while a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56 (quotations removed). In other words, "when an employment discrimination complaint contains fulsome factual context for the challenged adverse employment action, those allegations must be considered collectively in evaluating the reasonableness and plausibility of the inferences urged by the plaintiff."

*Townsend*, 236 F. Supp. 3d at 298.  A plaintiff may defeat her own claim "by alleging facts that render success on the merits impossible." *Sparrow,* 216 F.3d at 1116.  In total, when evaluating a motion to dismiss an employment discrimination claim, the "guiding lodestar is whether, assuming the truth of the factual allegations, the inferences of discrimination drawn by the plaintiff are reasonable and plausibly supported." *Lawson v. Sessions*, 271 F. Supp. 3d 119, 134 (D.D.C. 2017) (cleaned up); *see also Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (noting that court "need not, however 'accept inferences drawn by [a] plaintiff[ ] if such inferences are unsupported by the facts set out in the complaint.'" (quoting *Kowal*, 16 F.3d at 1276)).

Lastly, while at this stage the Court is generally limited to the facts alleged in the complaint, it may also consider "any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  Those matters include "publicly available materials and information, such as . . . information available on government websites." *Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, No. 19-cv-3629, 2021 WL 1198047, at *2 n.2 (D.D.C. Mar. 30, 2021).

## IV.  ANALYSIS

The Secretary seeks dismissal of all four counts for failure to state a claim.[8]  The Court dismisses Ms. Montgomery's Title VII claims because she has failed to allege facts showing that

---

[8] The Secretary originally argued that Ms. Montgomery failed to exhaust her administrative remedies for many of her claims, but abandoned this argument on reply.  *See* Def. Mem. Supp. Mot. to Dismiss ("Mot. Dismiss") at 7, ECF No. 10-1, Reply Supp. Mot. to Dismiss at 2 n.1, ECF No. 16.  Ms. Montgomery alleges exhaustion, and the Court assumes she has satisfied this requirement.  *Sandler v. Blinken*, No. 21-cv-2226, 2022 WL 4547557, at *4 (D.D.C. Sept. 29, 2022) ("A federal employee bringing claims under Title VII and the

she experienced race or sex discrimination.  The Court also dismisses Ms. Montgomery's claim under the Rehabilitation Act because she has not alleged facts that make it possible to infer that she suffered adverse employment actions because of her disability.

### A.  Title VII Discrimination Claims (Counts I, II and III)

Ms. Montgomery brings Title VII claims under three theories, arguing she suffered (I) sex discrimination based on disparate treatment and a hostile work environment; (II) race discrimination based on disparate treatment and a hostile work environment; and (III) retaliation against her for engaging in a protected activity.  Compl. ¶¶ 34, 42, 51.  The Court considers these three counts in turn, but notes at the outset that each claim lacks supporting allegations.

Title VII of the Civil Rights Act makes it "an unlawful employment practice . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Title VII does not prohibit discrimination based on disability.  *Thomas v. District of Columbia*, No. 22-cv-1269, 2023 WL 2610512, at *3 (D.D.C. Mar. 23, 2023) (dismissing Title VII claim based on disability discrimination).

When a protected characteristic is at issue, Title VII's anti-discrimination provision is "capacious" and "[o]nce it has been established that an employer has discriminated against an employee with respect to that employee's 'terms, conditions, or privileges of employment' because of a protected characteristic, the analysis is complete."  *Chambers v. District of Columbia*, 35 F.4th 870, 874–75 (D.C. Cir. 2022).  Examples of actions that meet this test

---

Rehabilitation Act must timely exhaust administrative remedies before filing suit in federal district court.").

include transferring an employee to a new position, firing an employee, decreasing pay, or any other number of activities.  *See id.*

Title VII also prohibits hostile work environments that constructively alter the terms of employment.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998) ("Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment").  To succeed on a hostile work environment claim, a plaintiff must show that the employer engaged in discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 183 (D.D.C. 2016).  In assessing whether a hostile work environment exists, "courts consider the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Richardson v. Petasis*, 160 F. Supp. 3d 88, 126 (D.D.C. 2015) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S 17, 23 (1993)).  Crucially, a plaintiff must also "establish that the allegedly harassing conduct . . . was based on a protected characteristic," or that there is "some linkage between the hostile behavior and [her] membership in a protected class."  *Byrd v. Vilsack*, 931 F. Supp. 2d 27, 45 (D.D.C. 2013).

### 1.  Sex Discrimination

That brings the Court to Ms. Montgomery's sex discrimination claim.  There are no allegations of any individual referencing Ms. Montgomery's sex or making any indirect comment referring to her sex.  Nor does the complaint contain any allegations suggesting Ms. Montgomery was treated differently because of her sex.  As a result, Ms. Montgomery does not state any claim rooted in sex discrimination.  *Spence v. Dep't of Veterans Affs.*, No. 19-cv-1947,

2022 WL 3354726, at *6 (D.D.C. Aug. 12, 2022) (dismissing sex discrimination claim because Plaintiff did not allege any facts supporting an inference that she suffered adverse actions based on her sex). The Court grants the Secretary's motion to dismiss Count I.

### 2. Race Discrimination

Ms. Montgomery's race discrimination claim is also deficient. All individuals whose race is stated in the complaint are African-American. Compl. ¶¶ 6, 8. Aside from these brief descriptions, there is only one further mention of an incident that appears related to race. When Ms. Horton scolded Ms. Montgomery for "challenging her" in front of other people, she stated "[y]ou have to be tactful and that is ghetto." *Id.* ¶ 21. The word "ghetto" has racial connotations. *See Garza v. Ranier L.L.C.*, A–12–CV–475–AWA, 2013 WL 3967786, at *4 (W.D. Tex. July 31, 2013) (denying summary judgment on discrimination claim where supervisor referred to "ghetto-ness" of African-American employee's office, and recognizing that the term "ghetto" has racial overtones) (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007)). So when Ms. Horton referred to Ms. Montgomery's behavior as "ghetto," it is not difficult to infer that she was using the term in reference to Ms. Montgomery's race. *See also White v. Gov't Emps. Ins. Co.*, 457 F. App'x 374, 381 (5th Cir. 2012) (recognizing that supervisor's use of the term ghetto may be "racially inappropriate").

Still, this is the sole allegation that could imply that Ms. Montgomery faced discrimination or a hostile workplace environment based on race or color. While Ms. Montgomery cites caselaw showing that hypothetically a single use of an offensive word could show a hostile work environment, such a case would involve highly objectionable racial epithets that are absent here. *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (noting that a single use of a "deeply offensive racial epithet . . . might well . . . be [] sufficient to establish a

hostile work environment").  More commonly, "isolated incidents of offensive language and even ethnic or racial slurs do not 'affect the conditions of employment to [a] sufficiently significant degree to violate Title VII.'"  *Nagi v. Chao*, No. 16-cv-2152, 2018 WL 4680272, at *3 (D.D.C. Sept. 28, 2018) (quoting *Deloatch v. Harris Teeter, Inc.*, 797 F. Supp. 2d 48, 62 (D.D.C. 2011)); *see also Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) ("Except in extreme circumstances, courts have refused to hold that one incident is so severe to constitute a hostile work environment.").  A single use of the word "ghetto" by Ms. Horton, who is herself African-American, may be distasteful but does not create a hostile work environment.  *See id.* (dismissing hostile work environment claim based on two occasions of "explicit and implicitly racially derogatory comments"); *Maestre v. SDH Servs. E., LLC*, No. 18-cv-02494, 2019 WL 7037484, at *6 (D.D.C. Dec. 20, 2019) ("[T]he bare fact that an individual belongs to a protected category, coupled with a single factual allegation concerning that category, is not enough to plausibly suggest the required connection.").  The Court grants the Secretary's motion to dismiss Count II.

### 3.  Retaliation

Finally, Ms. Montgomery also pleads a third count under Title VII of a "hostile work environment" based on "retaliation/reprisal," which the Court interprets as a retaliation claim.  Compl. ¶ 51.  Title VII bars federal agencies from retaliating against an employee because "[s]he has opposed 'a practice made an unlawful employment practice' by the statute" or "that the employee reasonably and in good faith believed was unlawful under the statute."[9]  *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012) (citing 42 U.S.C. § 2000e–3(a)).  The

---

[9] The D.C. Circuit has routinely applied Title VII's antiretaliation rule to federal employers.  *See Cruz v. McAleenan*, 931 F.3d 1186, 1193–94 (D.C. Cir. 2019).

antiretaliation provision sweeps broadly and prohibits retaliatory actions that extend outside the workplace and "do not affect the terms, conditions, or privileges of employment." *Chambers*, 35 F.4th at 876.  Still, the antiretaliation provision is intended to prevent "employer interference with unfettered access to Title VII's remedial mechanisms" and so only applies to "employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers."  *Id.* at 877 (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  "Not every complaint entitles its author to protection from retaliation under Title VII . . . because the plaintiff must demonstrate that [she] complained to the employer of some unlawful discrimination based on [her] membership in a protected class." *Keith v. U.S. Gov't Accountability Off.*, No. 21-cv-2010, 2022 WL 3715776, at *5 (D.D.C. Aug. 29, 2022) (quoting *Belov v. World Wildlife Fund, Inc.*, No. 21-cv-1529, 2021 WL 4773236, at *5 (D.D.C. Oct. 13, 2021)).

Ms. Montgomery has not successfully alleged a Title VII retaliation claim here because she has not alleged any examples of her opposing a practice that is unlawful under the statute. Although Ms. Montgomery gives examples of her raising grievances with her supervisors, none of those allegations make any reference to race, color or sex.  While Ms. Montgomery spoke up at a workplace townhall about a "hostile work environment," *see* Compl. ¶ 9, there are no details about what she said and whether the hostile work environment had anything to do with a protected class under Title VII,  *see Bloom v. McHugh*, 828 F. Supp. 2d 43, 58 (D.D.C. 2011) ("[T]hese bare allegations are insufficient to establish that [defendant] complained of conduct that is unlawful under Title VII.  A complaint that alleges harassment generally and generically and does not refer to harassment based on a protected category is not protected oppositional activity under Title VII.") (cleaned up).

In an attempt at salvaging the retaliation claim, Ms. Montgomery points to a complaint she filed with the OAWP whistleblower office on December 7, 2018.  Compl. ¶¶ 26.  But Ms. Montgomery does not allege anything about the subject matter of the complaint or what motivated her to file it.  The Secretary notes that the OAWP does not cover EEO claims, including discrimination and hostile work environment claims.[10]  *See Complaint & Disclosure Form*, Dept. of Veterans Affs., Office of Accountability and Whistleblower Protection, https://oawp.va.gov/intake/ (last accessed June 21, 2023) (matters beyond the Office's jurisdiction include "[a]llegations involving equal employment opportunity (EEO) discrimination, EEO reprisal, sexual harassment, and hostile work environment").  It is theoretically possible that Ms. Montgomery misinterpreted OAWP's jurisdiction and so attempted to raise race or sex discrimination concerns in her complaint, but Ms. Montgomery pleads nothing that could support this speculation.  With no allegations of Ms. Montgomery complaining about conduct prohibited by Title VII, there is no basis for a retaliation claim, and the Court grants the Secretary's motion to dismiss Count III.

## B.  Rehabilitation Act Claim (Count IV)

Ms. Montgomery's remaining count asserts disability discrimination in violation of the Rehabilitation Act.[11]  Resolving this question is a more complicated inquiry than for the Title VII

---

[10] The Court takes judicial notice of this fact.

[11] The complaint also pleads the disability discrimination count under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq*.  The Secretary argues that the ADA does not apply to employment discrimination claims by federal executive branch employees.  *See* Mot. Dismiss at 6–7.  Ms. Montgomery does not address the Secretary's ADA argument and therefore concedes it.  *See Wannall v. Honeywell, Inc*., 775 F.3d 425, 428 (D.C. Cir. 2014) ("if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded").  In any event, the Secretary is correct.  *Tobey v. Gen. Servs. Admin.*, 480 F. Supp. 3d 155, 164 n.3 (D.D.C. 2020) ("[T]he Rehabilitation Act provides the sole remedy for federal employees alleging [disability] discrimination.").

counts, particularly as the filings deviate on the nature of the claim.  Ms. Montgomery pleads her

Rehabilitation Act claim under a theory of "illegal disability discrimination."  Compl. ¶ 59.

Regardless, the Secretary interprets Ms. Montgomery as bringing a retaliation claim under the

Rehabilitation Act.  *See* Mot. Dismiss at 9 (disputing that Ms. Montgomery has sufficiently

alleged a retaliation claim under the Rehabilitation Act).  Ms. Montgomery's opposition goes

further in extending her claims, bringing both her Title VII retaliation and hostile work

environment theories to her Rehabilitation Act count.  *See* Pl.'s Mem. in Opp'n to Mot. to

Dismiss ("Pl. Opp") at 15, ECF No. 13 ("It is reasonable to infer that Plaintiff had a good faith

belief that Defendant violated . . . the Rehabilitation Act when she filed the whistleblower

complaint."); *id.* at 22 ("Plaintiff feared she could lose her job because of her disability and felt

threatened due to the hostile environment Human Resources' management subjected her to.").

Yet, the complaint never mentions a Rehabilitation Act claim for retaliation or hostile

workplace environment because of Ms. Montgomery's disability.  A plaintiff cannot amend a

complaint through opposition papers.[12]  *Bain v. Off. of Att'y Gen.*, No. 21-cv-1751, 2022 WL

17904236, at *12 (D.D.C. Dec. 23, 2022) ("Most fundamentally, a plaintiff may not amend her

complaint through her opposition to a motion to dismiss, so the Court cannot consider the new

allegations in [plaintiff's] opposition that she failed to properly assert.").  Consequently, the

Court will review Ms. Montgomery's Rehabilitation Act count under a claim of disability

discrimination.  *See Melkumyan v. Power*, No. 21-cv-2700, 2022 WL 2904266, at *5 (D.D.C.

---

[12] Ms. Montgomery's opposition repeatedly characterizes the facts alleged in a manner
inconsistent with the complaint.  For example, while the opposition argues that "Ms.
Montgomery also learned that Defendant's Human Resources management team had previously
mistreated and discriminated against disabled African-American female employees," Pl.'s Opp.
at 21, the cited paragraph of the complaint says nothing about discrimination based on disability,
race, or sex, *see* Compl. ¶ 9.  Rather than cataloguing every such discrepancy, the Court notes
simply that it will read the complaint as written.

July 22, 2022) (rejecting a plaintiff's attempt to add a hostile work environment claim in an opposition brief); *Taylor v. Mills*, 892 F. Supp. 124, 137 (D.D.C. 2012) (same).

The Rehabilitation Act, 29 U.S.C. §§ 791 *et seq.,* "governs employee claims of [disability] discrimination against the Federal Government." *Ward v. McDonald*, 762 F.3d 24, 28 (D.C. Cir. 2014) (citation and internal quotations omitted). It provides generally that "[n]o otherwise qualified individual with a disability" may be discriminated against by a federal employer "solely by reason of her or his disability." 29 U.S.C. § 794(a). "The standards used to determine whether [the Rehabilitation Act's nondiscrimination provision] has been violated . . . shall be the standards applied under . . . the Americans with Disabilities Act . . . ." *Id.* § 794(d). And so "[b]ecause of the similarities between the Rehabilitation Act and the ADA, cases interpreting either are applicable or interchangeable."[13] *Alston v. Washington Metro. Area Transit Auth.*, 571 F. Supp. 2d 77, 81 (D.D.C. 2008) (citation and internal quotations omitted). One exception is that while the D.C. Circuit has not resolved the proper causation standard for ADA claims, *see Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, No. 18-cv-1702, 2021 WL 4033071, at *10 (D.D.C. Sept. 3, 2021), the Rehabilitation Act has a clear "but-for" causation standard, *see Drasek v. Burwell*, 121 F. Supp. 3d 143, 154 (D.D.C. 2015).

Accordingly, to state a claim for disability discrimination under the Rehabilitation Act, Ms. Montgomery must allege that (1) she was a qualified individual with a disability, (2) her employer knew of her disability, and (3) she suffered an adverse employment action because of her disability. *See Congress v. District of Columbia*, 324 F. Supp. 3d 164, 175 (D.D.C. 2018)

---

[13] As discussed in more detail *supra* note 14, this fungibility between statutes also therefore generally extends to cases interpreting the Rehabilitation Act and Title VII. *See Mogenhan v. Napolitano,* 613 F.3d 1162, 1166 (D.C. Cir. 2010) (noting that "Title VII of the Civil Rights Act . . . contains anti-discrimination and retaliation provisions that are indistinguishable from those of the ADA" which is incorporated into the Rehabilitation Act).

(citing *Blackwell v. SecTek, Inc.*, 61 F. Supp. 3d 149, 156 (D.D.C. 2014)); *see also Drasek*, 121 F. Supp. 3d at 154 ("Notably, under the but-for causation standard, a claim cannot succeed unless the protected trait—here, disability—was the reason that the employer decided to act.") (quotations removed).  Adverse employment actions include, but not are limited to, being "fired or denied a job or promotion" or "suffer[ing] any reductions in salary or benefits."[14] *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

There is no dispute that the first and second elements of a claim are present here: Ms. Montgomery was qualified for her job, her hearing loss is a disability, and her employer knew she was disabled.  Ms. Montgomery was initially qualified enough to be hired, and she was "fully successful" at carrying out her responsibilities.  Compl. ¶ 8.  The Secretary does not contest that Ms. Montgomery was disabled for the purposes of the statute.  And Ms. Montgomery was hired through the Schedule A authority specifically for disabled individuals,

---

[14] Recent caselaw in this District questions the current standard for pleading a discrimination claim under the Rehabilitation Act.  The D.C. Circuit has long interpreted Title VII and the Rehabilitation Act in parallel.  *See Bain*, 2022 WL 17904236, at *19 (citing cases).  And "until recently, plaintiffs in this circuit were required to allege that they had suffered 'objectively tangible harm' in order to plead an adverse action under [both] statutes."  *Id.* at 18.  Recently, the D.C. Circuit adopted a more capacious view of when employment actions can give rise to a Title VII discrimination claim.  *See Chambers*, 35 F.4th at 874 (holding that statutory text requires only discrimination with respect to an employee's "terms, conditions, or privileges of employment" without any further test); *see also supra* p. 10 (discussing that standard).  In *Bain*, the District Court found that while the Circuit has not yet resolved whether the *Chambers* standard applies to Rehabilitation Act claims, doing so would be the most consistent approach.  *See Bain*, 2022 WL 17904236, at *19 (observing that *Chambers* was based on a close reading of statutory text, and that the language of Title VII and the Rehabilitation Act is identical in the relevant sections).  This Court need not decide the proper standard here, as the parties have not briefed the issue in any detail, and because all of Ms. Montgomery's allegations fare the same under either test.  In other words, some of her alleged adverse actions would satisfy even the more stringent pre-*Chambers* standard, while the rest fail altogether to constitute a change in terms, conditions, or privileges of employment under the post-*Chambers* view.

meaning that her employer knew at the outset of her tenure that she was disabled.  Co-workers

also asked Ms. Montgomery about her hearing loss on multiple occasions.  *See* Compl. ¶¶ 14–15.

The Secretary does dispute that Ms. Montgomery suffered any adverse employment

actions, and if she did, disputes that it was because of her disability.  First, the Court agrees that

Ms. Montgomery has listed several scuffles and contentious meetings that, by their own, would

not qualify as adverse actions.  *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) ("[N]ot

everything that makes an employee unhappy is an actionable adverse action. Minor and even

trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would

otherwise form the basis of a discrimination suit." (internal quotation marks omitted)).  While

perhaps these situations were unpleasant, the Court cannot find that it was an adverse action, or

affected the terms of employment, when Ms. Williams yelled at Ms. Montgomery in October

2018, or in December 2018 when Ms. Horton criticized Ms. Montgomery for questioning her

authority.  Compl. ¶ 59; *Taylor v. Haaland*, No. 20-cv-3173, 2022 WL 990682, at *3 (D.D.C.

Mar. 31, 2022) ("although [Plaintiff's] coworkers' comments were rude and disrespectful, this

Court has consistently held that such comments fail to constitute an adverse employment

action").

Similarly, the Court cannot find adverse action or a change in terms of employment when

Ms. Horton indicated that Ms. Montgomery's Schedule A letter was not signed by a certified

physician, or when Ms. Montgomery simply "learned from two other employees that Ms. Horton

said employees with disabilities who were hired under the Schedule A Hiring Authority should

be terminated."  Compl. ¶ 59.  These appear to be nothing more than statements with no actual

effect, and after all, "not everything that happens at a workplace affects an employee's 'terms,

conditions, or privileges of employment.'"  *Chambers*, 35 F.4th at 874.

However, Ms. Montgomery does plead two viable adverse actions.  Ms. Williams did not properly provide Ms. Montgomery with her fiscal year 2017 performance appraisal, which alone would not be an adverse action, but apparently prevented Ms. Montgomery from receiving a financial cash award.  Compl. ¶¶ 25, 59; *Weber v. Battista,* 494 F.3d 179, 185 (D.C. Cir. 2007) (holding performance evaluation to be materially adverse where it resulted in employee not receiving a cash award); *Johnson v. Bolden*, 699 F. Supp. 2d 295, 300 (D.D.C. 2010).  Ms. Montgomery also had to reapply for her job, and while she received the job back, she did not receive credit for the time she had served and her promotion to the GS-09 was delayed until a time "after she was required to receive a promotion," depriving Ms. Montgomery of a higher salary and delaying her professional advancement.  Compl. ¶¶ 27, 59; *Johnson*, 699 F. Supp. 2d at 300 ("the plaintiff has identified adverse employment actions in his lack of promotion").  The Secretary's attempt to argue these were not adverse actions is unpersuasive.[15]

The problem for Ms. Montgomery, though, is that the complaint fails to connect those adverse actions to her disability or allege that they were the result of discrimination.  To be certain, Ms. Montgomery's disability factors into her claim insofar as she was hired under Schedule A authority for hiring disabled employees.  Compl. ¶ 8.  But the story that eventually emerges from the scattered allegations in the complaint has little to do with Ms. Montgomery's disability, and instead shows the Department trying to correct an administrative error in posting

---

[15] The Court disagrees with the Secretary that Ms. Montgomery did not "plead any facts to support a plausible inference that the failure to issue her performance appraisal was materially adverse," because Ms. Montgomery connected that omission to her not receiving a cash award. Mot. Dismiss at 16.  The Secretary also claims that Ms. Montgomery does not allege "that she would have gotten higher pay or better benefits had she been credited for her prior time in her position." *Id.* at 15–16.  Ms. Montgomery has linked her lack of promotion with the failure to credit her for time served, and the Court can reasonably infer that promotion to the GS-09 level comes with a pay increase.

Ms. Montgomery's position.  In summary, Ms. Montgomery and two other disabled employees hired under Schedule A were told that their initial appointments were improper, and the Department thereafter made an effort to regularize the appointments.  *Id.* ¶ 8.  Ms. Montgomery does not allege any facts disputing that her appointment was improper, but she still objects to her forced reapplication as part of the regularization, and says that the Department did not follow proper procedure for addressing erroneous appointments.  *Id.* ¶ 22.

To attribute her appointment issue to disability discrimination, Ms. Montgomery alleges her secondhand knowledge that Ms. Horton said that Ms. Montgomery and two other disabled employees "should be terminated" and "never should have been hired in Human Resources."  *Id.* ¶ 11.  Ms. Montgomery asks the Court to infer that Ms. Horton's statement shows an effort to discriminate based on disability.  But we also know that these employees in fact were improperly hired; Ms. Montgomery is quoted as acknowledging "the issue with regularizing the position we currently hold."  *Id.* ¶ 12.  Ms. Horton claimed to be an "'expert' on schedule A and staffing and recruitment, and that she was working on [one of the disabled employee's] case sometime in January."  *Id.*  The complaint depicts Ms. Horton as looking for solutions to the initial improper appointments and has nothing more than conjecture to suggest that disability discrimination played any role in the regularization process.  It also bears noting that the regulation authorizing Schedule A hiring, 5 C.F.R. § 213.3102(u), "is permissive; there is no obligation to hire a disabled applicant" under this authority.  *Ward-Johnson v. Glin*, No. 1:19-cv-00534, 2020 WL 2770018, at *9 (D.D.C. May 28, 2020).  An attempt to fix an improper exercise of Schedule A hiring does not, on its own, support an inference of disability discrimination.

Indeed, Ms. Montgomery eventually did reapply and was rehired to her position in March 2019, which is inconsistent with the idea that Ms. Horton's plan to regularize the appointments

was discriminatory.  Compl. ¶ 22.  Even so, the Department did not follow "VA Handbook 5005/65, Part I, Appendix C, Regularizing Erroneous Title 5 Appointments" when it failed to provide Ms. Montgomery with credit for her time already served in the role.  *Id.*  The complaint gives no more details about the proper approach specified in the handbook, and at this stage of litigation, the Court has no occasion to wade through those procedures.  Nonetheless, this is a claim about disability discrimination, and there is nothing in the allegations that directly connects the failure to follow proper procedure with Ms. Montgomery's disability.[16]

Ms. Montgomery also alleges conflict with her supervisor, Ms. Williams, that still fails to support any inferences of disability discrimination.  Her repeated disputes with Ms. Williams— where Ms. Williams did not provide a performance evaluation on time, eventually forged an evaluation, and then later failed to approve Ms. Montgomery's time entries—culminated with Ms. Williams making a curt comment that Ms. Montgomery "can't hear."  *Id.* ¶¶ 13–15, 25. This statement prompted Ms. Montgomery to ask Ms. Williams if she was discriminating against her disability.  *Id.* ¶ 14.  While Ms. Williams's remark comes off as rude, there is no other allegation that suggests Ms. Williams's preceding failure to issue an accurate and timely performance evaluation was because of Ms. Montgomery's disability.  Instead, Ms. Williams's

---

[16] True, "there was an unexplained deviation from [the Department's] standard practices – and such a deviation can justify an inference of discriminatory motive." *Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003) (quotation omitted).  But that deviation and Ms. Montgomery's disability are never connected; there is nothing in the allegations to support an inference that the Department deviated from policy because of Ms. Montgomery's disability.  And given the abundant factual allegations that Ms. Montgomery's re-application was indeed a way to address her erroneous appointment, the Court also cannot use this deviation from policy to infer that the forced re-application was a pretext for discrimination.  *See also Jeffries v. Barr*, 965 F.3d 843, 858 (D.C. Cir. 2020) (finding in the summary judgment context that an "employer's failure 'to follow its own regulations and procedures, alone, may not be sufficient to support' the conclusion that its explanation for the challenged employment action is pretextual.") (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

brief comment was made in the moment of a heated discussion about her apparent administrative errors. *Id.*

Overall, the timeline is unhelpful for making Ms. Montgomery's requested inferences. Ms. Williams's interjection about Ms. Montgomery's disability in October 2018 occurred *after* Ms. Montgomery's appointment was identified as improper in June 2018, *after* Ms. Horton declared in September 2018 that her plan was to have Ms. Montgomery reapply, and *after* Ms. Williams delayed and forged Ms. Montgomery's performance appraisal in August and September 2018 . *Id.* ¶¶ 12–14, 25. The Court is unable to infer that Ms. Williams's comment revealed a discriminatory intent behind all these prior events, or that it somehow explains the much later failure in March 2019 to give Ms. Montgomery credit for time served. What's more, the complaint has no details indicating that Ms. Williams played any role in the Department's decision to make Ms. Montgomery reapply for her position, or in the eventual process of rehiring her.

Finally, while Ms. Montgomery cites the Rehabilitation Act's mandate that employers offer reasonable accommodations for disabled employees, *see* Compl. ¶ 59, she does not allege that she required or sought any accommodations for her hearing loss. For that matter, aside from a handful of remarks from co-workers asking or confirming that Ms. Montgomery suffered hearing loss, *see* Compl. at ¶¶ 14–15, there are no allegations at all about how her disability affected her employment. Except for the initial Schedule A authority Ms. Montgomery was hired under, there is little link between her disability and the events in the complaint.[17]

---

[17] The complaint's vague assertion that "Defendant may have engaged in other discriminatory practices that are not yet fully known" does not rescue its failure to specify any such practices. Compl. ¶ 37.

Ultimately, the complaint simply cannot support the inference that Ms. Montgomery's disability was the cause of her not receiving her 2017 performance award, or that it was the reason she was not given credit for time served in her incorrectly appointed role. *See Townsend*, 236 F. Supp. 3d. at 305 ("Assuming the truth of the totality of the factual allegations in the complaint, such an inference is not reasonable and plausibly supported."). Even making the required generous inferences in Ms. Montgomery's favor, the Court concludes that Ms. Montgomery has only alleged that she suffered from administrative mishaps and less-than-ideal colleagues. The Court therefore grants the Secretary's motion to dismiss Count IV.

* * *

Ms. Montgomery has not requested leave to amend her complaint, but the Court nonetheless *sua sponte* grants Ms. Montgomery with such leave. *See United States ex rel. Morsell v. Symantec Corp.*, 130 F. Supp. 3d 106, 126 (D.D.C. 2015) (granting *sua sponte* leave to amend); Fed. R. Civ. P. 15(a) (leave to amend should be "freely given when justice so requires"). If Ms. Montgomery decides to file an amended complaint, the Court recommends that she make stronger connections between events, clarifies the theories underlying her claims, and provides allegations that separately support an inference of discrimination based on disability, race, or sex.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss, ECF No. 10, is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  June 29, 2023                                      RUDOLPH CONTRERAS
                                                                        United States District Judge