**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| DYTAUN MONTGOMERY, | : | | |
| | : | | |
| *Plaintiff,* | : | | |
| | : | | |
| v. | : | Civil Action No.: | 22-1715 (RC) |
| | : | | |
| DENIS MCDONOUGH, | : | Re Document No.: | 23 |
| Secretary of Veterans Affairs | : | | |
| | : | | |
| *Defendant.* | : | | |

<u>**MEMORANDUM OPINION**</u>

**DENYING DEFENDANT'S MOTION TO DISMISS**

## I. INTRODUCTION

Plaintiff Dytaun J. Montgomery brings this employment discrimination action under the Rehabilitation Act, 29 U.S.C. §§ 791, against Denis McDonough in his official capacity as Secretary of Veterans Affairs. The Court previously granted a motion to dismiss in this action for a failure to state a claim but granted Ms. Montgomery leave to file an amended complaint. Now, the Secretary again moves to dismiss under Rule 12(b)(6) for failure to state a claim. For the reasons set forth below, the Court DENIES the Secretary's motion to dismiss.

## II. FACTUAL BACKGROUND

The amended complaint is similar to the original complaint, so the Court borrows from its previous recounting of Ms. Montgomery's allegations. *See Montgomery v. McDonough*, No. 22-cv-1715, 2023 WL 4253490, at *1–4 (D.D.C. June 29, 2023). Ms. Montgomery suffers

"permanent severe hearing loss in her left ear."[1]  Amended Complaint ("Am. Compl.") ¶¶ 7,

ECF No. 1.  Ms. Montgomery experiences vertigo episodes and must take her prescribed

medication, meclizine, "which affects her ability to function in a normal capacity."[2]  *Id.*  In 2015,

Ms. Montgomery started as a GS-07 "Human Resources Specialist" at the United States

Department of Veterans Affairs Medical Center.  *Id.* ¶ 6.  Ms. Montgomery was hired through

Schedule A, a special hiring authority that federal agencies may use to hire individuals with

disabilities instead of going through the standard hiring process.[3]  *Id.* ¶ 7.  Ms. Montgomery's job

duties included "facilitating orientation for new hires, processing market pays for physicians,

processing various personnel actions, position management, completing preemployment

processes, and other duties as assigned."  *Id.* ¶ 6.  During the "relevant period," Ms.

Montgomery's "first level supervisor was Human Resources Supervisor Cheryl Williams," and

her "second level supervisor was Chief Human Resources Officer Shannon Carrol."  *Id.*  Ms.

Montgomery also worked with Ms. Taneshia Horton, whose title is given as "Assistant Chief

Human Resources Officer" although it is unclear precisely how Ms. Horton fit into the office's

hierarchy.  *Id.* ¶ 7.

    As part of her hiring process, Ms. Montgomery produced a Schedule A letter

documenting her hearing loss.  *Id.*  In 2018, "on an unspecified date," Ms. Horton "indicated that

Ms. Montgomery's Schedule A letter was not signed by a certified physician."  *Id.* ¶ 8.  Ms.

Montgomery does not elaborate on the Schedule A letter and does not state whether she believes

---

[1] As required at the motion to dismiss stage, all allegations are assumed as true.  *See
Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).

[2] The amended complaint makes no further reference to Ms. Montgomery's vertigo or
side effects from meclizine.

[3] *See* 5 C.F.R. § 213.3102.

Ms. Horton was incorrect, whether she provided a revised Schedule A letter, or explain how this incident influenced the other events described in the amended complaint.  Furthermore, in January 2018, Ms. Horton "conducted a Fact Finding regarding an alleged erroneous appointment of Ms. Montgomery and other human resources staff."  *Id.*  Ms. Montgomery submitted a FOIA request regarding Ms. Horton's "Fact Finding Report," however "the Agency never provided the report."[4]  *Id.*

On April 24, 2018, Ms. Montgomery and other Human Resources staff "stood up" at a department town hall meeting to address a hostile work environment perpetuated by the head of Human Resources at the Medical Center.  *Id.* ¶ 9.  Shortly thereafter, that Human Resources head official was reassigned to a different position outside of the Medical Center.  *Id.*  The amended complaint does not describe the nature of the hostile work environment and does not provide allegations linking this situation to any other events.

In June 7, 2018, Ms. Montgomery and two other disabled coworkers hired under Schedule A were called into a meeting with Ms. Charlene McCollum, an employee with the Department's Veterans Integrated Services Network ("VISN").[5]  *Id.* ¶ 10.  Ms. McCollum informed Ms. Montgomery and her two disabled coworkers that their appointments to their current roles had been announced incorrectly and that they would have to reapply to their positions to "regularize the situation."  *Id.*  They were also informed that "one of their colleagues had filed a complaint" presumably related to this hiring irregularity.  *Id.*  Ms. McCollum told Ms. Montgomery and the others that "someone from her office was going to re-announce the position, no other staff would know about it, and that she would let them know when it was time

---

[4] The amended complaint generally refers to the Department of Veterans Affairs as the "Agency," but the Court will call it "the Department."

[5] Ms. McCollum's title is not specified in the amended complaint.

to reapply." *Id.* Ms. Montgomery alleges that "Ms. McCollum received guidance that it was not necessary to require Ms. Montgomery to reapply for her position yet she still required her to do so," although it is unclear who provided this guidance. *Id.*

On or around September 1, 2018, Ms. Montgomery learned "from two other employees" that Ms. Horton had said that "employees with disabilities who were hired under the Schedule A Hiring Authority should be terminated" and "should have never been hired in Human Resources." *Id.* ¶ 11. Ms. Montgomery "discussed this incident" with Ms. Carrol, who "told Ms. Montgomery that she told Ms. Horton to show her in the policy." *Id.* On September 17, 2018, Ms. Montgomery was excluded from a meeting with Ms. Horton and the other two Schedule A hires, and asked one of the other hires why she was not included. *Id.* ("I wonder why I was not included in that meeting, since I was one of the ones, [sic] that was involved in the issue with regularizing the position we currently hold."). According to the amended complaint, Ms. Montgomery learned that at that meeting, Ms. Horton said she was an "expert" on Schedule A and staffing, and that she had a plan to "regularize" the positions "sometime in January 2018 [sic]."[6] *Id.* While Ms. Horton intended to use one Schedule A employee's master's degree to regularize her role, Ms. Montgomery and another employee would have to "reapply for their positions or face termination." *Id.*

Although it is unclear if or how it relates to the erroneous appointment regularization process, Ms. Montgomery also encountered difficulties with her supervisor, Ms. Williams, at around the same time. On August 27, 2018, Ms. Montgomery found out that Ms. Williams was basing Ms. Montgomery's performance appraisal for fiscal year 2017 on a prior year's appraisal. *Id.* ¶ 21. Ms. Montgomery refused to sign that appraisal because it was taken from the previous

---

[6] The Court assumes this allegation should say January 2019.

appraisal completed by another supervisor, meaning that Ms. Williams did not rate Ms. Montgomery herself.  *Id.*  Later, Ms. Montgomery told another employee that her appraisal was not completed for fiscal year 2017.[7]  *Id.* ¶ 22.  In the end, Ms. Montgomery's "performance appraisal was never completed for FY 2017," *id.,* "which prevented her from getting a cash award,"[8] *id.* ¶ 28.

In October 2018, Ms. Montgomery had a contentious verbal dispute with Ms. Williams about timekeeping practices and overtime pay.  *Id.* ¶ 12.  During that quarrel, "Ms. Williams yelled at Ms. Montgomery and said she was tired of employees telling her she was not doing her job."  *Id.*  As the conversation grew more heated, another co-worker asked Ms. Montgomery if her left ear was her "bad ear," and Ms. Montgomery confirmed her hearing loss in that ear.  *Id.* ¶ 13. Ms. Williams added "[y]eah, she can't hear."  *Id.*  Following this remark, Ms. Montgomery said to Ms. Williams "[d]on't try and blame this on my disability" before further asking "[a]re you discriminating against my disability?"  *Id*.  Ms. Williams denied making the "she can't hear" comment, Ms. Montgomery repeated the initial comment back to her, and Ms. Williams "ultimately told Ms. Montgomery to get out of her office."  *Id*.

Ms. Horton overheard these events "because she was on a call" and afterward she asked Ms. Montgomery to come into her office.[9]  *Id.* ¶ 14.  Ms. Montgomery discussed the incident

---

[7] *Approaches to Calculating Performance-Based Cash Awards*, Office of Personnel Management, https://www.opm.gov/policy-data-oversight/performance-management/performance-management-cycle/rewarding/approaches-to-calculating-performance-based-cash-awards/ (last accessed March 29, 2024) ("A performance-based cash award (commonly known as a rating-based award) recognizes an employee's performance over an entire rating period.").

[8] The original complaint contains additional allegations where Ms. Montgomery was shown a version of a 2017 appraisal that she believed to be a forgery.

[9] Although not exactly clear, it appears that Ms. Horton was listening to the meeting through a phone call.  Am. Compl. ¶¶ 14–15.  When Ms. Montgomery first entered the meeting,

with Ms. Horton but felt uncomfortable because she knew that Ms. Horton was "involved with Ms. Montgomery's promotion/the fact finding prior to her coming on board." *Id.* ¶ 16. Ms. Horton asked Ms. Montgomery "if she had a disability and Ms. Montgomery confirmed her disability." *Id.* ¶ 14. Ms. Montgomery spoke with Ms. Horton "about respect in the workplace" and "Ms. Montgomery indicated that she did not want to go into detail because she had previously discussed the issue with Ms. Carrol, and she would have to share that information with her." *Id.* Ms. Montgomery also "told Ms. Carrol she did not want to work under Ms. Williams when the new supervisor came on board." *Id.* Ms. Montgomery did not know the outcome of the conversation with Ms. Horton. *Id.* ¶ 16.

During a staff discussion "[l]ater in October 2018," *id.* ¶ 14, Ms. Montgomery asked Ms. Horton a question, and she "looked directly at Ms. Montgomery and ignored her and started speaking to another staff member." *Id.* Ms. Montgomery asked the question a second time, and Ms. Horton again looked at her and did not respond. *Id.* Ms. Horton then got up and left the room. *Id.* Ms. Horton's conduct embarrassed Ms. Montgomery, and she believed "Ms. Horton wanted to communicate to her that she was less than the other staff members." *Id.* Ms. Horton would "either ignore Ms. Montgomery or speak to her out loud in the office in front of her peers." *Id.* Ms. Horton "did not speak to or treat other staff who did not have a hearing disability in this manner."[10] *Id.*

---

Ms. Williams was on the phone with an IT Department employee who processed timesheets, who later "said she also had heard Ms. Williams and Ms. Montgomery on the phone." *Id.* ¶¶ 12, 15.

[10] Throughout the amended complaint, Ms. Montgomery has added a largely identical sentence to the end of several paragraphs stating that various actions "were discriminatory based on Ms. Montgomery's healing [sic] disability because Ms. Horton did not speak to or treat other staff who did not have a hearing disability in this manner." *Id.* ¶¶ 11, 14, 17; *id.* ¶ 10 (same, but for Ms. McCollum); *id.* ¶ 12 (same, but for Ms. Williams).

On December 12, 2018, Ms. Horton held a staff meeting where she created a "Tiger Team" of employees that would conduct a series of audits. *Id.* ¶ 17. When one employee asked Ms. Horton if the Tiger Team would complete this task from beginning to end, and Ms. Horton answered yes, Ms. Montgomery spoke up and stated that she had heard differently from Ms. Horton in a previous meeting. *Id.* ¶ 17. Ms. Horton told Ms. Montgomery she did not say that and Ms. Montgomery repeated that this was not what she had previously heard. *Id.* Ms. Montgomery asked "[c]ould we discuss this offline?" and Ms. Horton responded "No, I'm going to address it right now." *Id.* Ms. Carrol came into the meeting and clarified the role of the Tiger Team. *Id.* ¶ 18. At the end of the meeting, Ms. Horton called Ms. Montgomery into her office to say that Ms. Montgomery should not challenge her in a meeting in front of other company. *Id.* ¶ 19. Ms. Horton stated that "no person who reports to her should challenge her in a meeting or in front of others." *Id.* Ms. Horton chided that "[y]ou have to be tactful and that is ghetto." *Id.* A back-and-forth began where Ms. Montgomery apologized to Ms. Horton, the dispute continued, and Ms. Montgomery eventually walked out of Ms. Horton's office. *Id.*

In January 2019, consistent with previous allegations where Ms. Horton said she would turn to Ms. Montgomery's case at that point in time, Ms. Montgomery was required to reapply for the job she had held for over a year and a half.[11] *Id.* ¶ 20. On March 1, 2019, Ms. Montgomery "was offered the job, however, she was not credited with the year and eight months she had already worked in the position." *Id.* Although it is hard to discern from the amended complaint, Ms. Montgomery may also have been required to reapply for her job a *second* time,

---

[11] Ms. Montgomery was originally hired in 2015, so it is unclear how the complaint arrives at this timeline of a year and a half of experience in her role by January 2019. *Id.* ¶ 6. Reading between the lines of the complaint, it appears that Ms. Montgomery received an unmentioned promotion in 2017.

based on the allegation that "Ms. Montgomery had to reapply for the position in the beginning of March 2019 that was reposted by VISN leadership." *Id.* Either way, at least once, Ms. Montgomery and other employees "were told that if they did not apply, they would be terminated." *Id.; see also id.* ¶ 11 (alleging that as of September 2018, Ms. Horton planned to require Ms. Montgomery to "reapply or face termination."). After reapplying, "Ms. Montgomery never received an Official Letter." *Id.* ¶ 20. Unnamed Veterans Affairs leadership also deleted SF50's out of Ms. Montgomery's personnel file based on Ms. McCollum stating that Ms. Montgomery sat in an erroneous appointment. [12] *Id.*

Ms. Montgomery states that the "Agency failed to follow its own policies when it required that she reapply for her position," *id.* ¶ 28, and more specifically that Ms. McCollum "did not follow VA Handbook 5005/65, Part I, Appendix C, Regularizing Erroneous Title 5 Appointments," *id.* ¶ 20. Ms. Montgomery alleges that the "Agency did not require employees who were not hired under Schedule A to reapply for their positions," although there are no details on whether these other employees were in a comparable situation of erroneous appointment. *Id.* By March 5, 2019, Ms. Montgomery had not been promoted to the GS-09 level despite having sufficient experience. *Id.* ¶ 21.

The amended complaint has no allegations about specific events beyond March 5, 2019, other than Ms. Montgomery's attempts to receive relief through the EEO process. On March 18, 2019, Ms. Montgomery filed a formal EEO complaint with the Department of Veterans Affairs. *Id.* ¶ 23. She requested a hearing before the Equal Employment Opportunity Commission, which found in favor of the Department. The Department issued a final decision on March 16, 2022.

---

[12] An SF-50 is a federal employment form describing various personnel actions.

Following her efforts to pursue administrative remedies, Ms. Montgomery brought this action on June 14, 2022, alleging several different discrimination claims, including race, gender, and disability discrimination.  *See* Complaint ("Compl."), ECF No. 1.  The Secretary moved to dismiss for failure to state a claim.  The Court granted the motion to dismiss on June 29, 2023 but granted Ms. Montgomery leave to file an amended complaint if she wished.  *Montgomery,* 2023 WL 4253490, at *11.  Ms. Montgomery filed an amended complaint on August 7, 2023. *See* Am. Compl.  Ms. Montgomery now brings two closely related disability discrimination claims under the Rehabilitation Act: a disparate treatment claim and a hostile work environment claim.  *Id.* at 12.  The Secretary has again moved to dismiss for failure to state a claim, and that motion is now fully briefed.  *See* Def.'s Mot. Dismiss Am. Compl., ECF No. 23; Def.'s Mem. Supp. Mot. Dismiss ("Def.'s Mem."), ECF No. 23-1; Pl.'s Mem. P&A Opp. Mot. Dismiss. ("Pl.'s Opp."), ECF No. 26, Def.'s Reply Supp. Mot. Dismiss ("Reply"), ECF No. 27.

### III.  LEGAL STANDARD

A plaintiff must provide a "short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (citation omitted).  A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint" by asking whether the plaintiff has properly stated a claim for which relief can be granted.  *Browning v. Clinton,* 292 F.3d 235, 242 (D.C. Cir. 2002). In considering such a motion, the complaint must be construed "liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged."  *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006) (citing *Kowal v. MCI Commc'ns Corp*., 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *Twombly*, 550 U.S. at 555, "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2006) (internal quotation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a motion to dismiss. *Id*. Similarly, there is no obligation to accept a plaintiff's legal conclusions as true, nor to presume the truth of legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555.

For employment discrimination suits, a "plaintiff is not required to plead every fact necessary to establish a *prima facie* case to survive a motion to dismiss." *Jones v. Air Line Pilots Ass'n, Intern*, 642 F.3d 1100, 1104 (D.C. Cir. 2011) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)). Yet while a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56 (quotations removed). A plaintiff may defeat her own claim "by alleging facts that render success on the merits impossible." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1116 (D.C. Cir. 2000). In total, when evaluating a motion to dismiss an employment discrimination claim, the "guiding lodestar is whether, assuming the truth of the factual allegations, the inferences of discrimination drawn by the plaintiff are reasonable and plausibly supported." *Lawson v. Sessions*, 271 F. Supp. 3d 119, 134 (D.D.C. 2017) (cleaned up); *see also Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (noting that court "need not, however 'accept inferences drawn by [a] plaintiff[ ] if such inferences are unsupported by the facts set out in the complaint.'" (quoting *Kowal*, 16 F.3d at 1276)).

Lastly, while at this stage the Court is generally limited to the facts alleged in the complaint, it may also consider "any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). Those matters include "publicly available materials and information, such as . . . information available on government websites." *Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, No. 19-cv-3629, 2021 WL 1198047, at *2 n.2 (D.D.C. Mar. 30, 2021).

## IV.  ANALYSIS

Although Ms. Montgomery's amended complaint asserts a claim under the Rehabilitation Act for "disability discrimination" through "disparate treatment and hostile work environment" in a single "Count I", the Court understands these to be two separate claims and will analyze them separately. Am. Compl. at 12; *id.* ¶ 28; *see* Def.'s Mot. at 8, 13 (also viewing these claims as separate). Ultimately, while the amended complaint is similar to the previously dismissed complaint, several new allegations have tightened the narrative so as to allow Ms. Montgomery to state a disparate treatment claim. For related reasons, she also has narrowly met the pleading standard for a hostile work environment claim. Consequently, the Court will deny the Secretary's motion to dismiss.[13]

### A.  Ms. Montgomery's Disparate Treatment Claim Goes Forward

The Rehabilitation Act, 29 U.S.C. §§ 791 *et seq.,* "governs employee claims of [disability] discrimination against the Federal Government." *Ward v. McDonald*, 762 F.3d 24,

---

[13] Ms. Montgomery alleges administrative exhaustion, the Secretary does not dispute this point, and the Court assumes she has satisfied this requirement. *Sandler v. Blinken*, No. 21-cv-2226, 2022 WL 4547557, at *4 (D.D.C. Sept. 29, 2022) ("A federal employee bringing claims under … the Rehabilitation Act must timely exhaust administrative remedies before filing suit in federal district court.").

28 (D.C. Cir. 2014) (citation and internal quotations omitted).  It provides that "[n]o otherwise qualified individual with a disability" may be discriminated against by a federal employer "solely by reason of her or his disability."  29 U.S.C. § 794(a).  "The standards used to determine whether [the Rehabilitation Act's nondiscrimination provision] has been violated . . . shall be the standards applied under . . . the Americans with Disabilities Act . . . ."  *Id.* § 794(d).  And so "[b]ecause of the similarities between the Rehabilitation Act and the ADA, cases interpreting either are applicable or interchangeable."[14]  *Alston v. Washington Metro. Area Transit Auth.*, 571 F. Supp. 2d 77, 81 (D.D.C. 2008) (citation and internal quotations omitted).  One important exception is that while the D.C. Circuit has not resolved the proper causation standard for ADA claims, *see Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, No. 18-cv-1702, 2021 WL 4033071, at *10 (D.D.C. Sept. 3, 2021), the Rehabilitation Act has a clear "but-for" causation standard whereby the disability must be "the reason that the employer decided to act."  *Rosen-Kellogg v. Mayorkas*, No. 22-cv-3028, 2023 WL 7697043, at *8 (D.D.C. Nov. 15, 2023) (quoting *Drasek v. Burwell*, 121 F. Supp. 3d 143, 154 (D.D.C. 2015)).

Accordingly, to state a claim for disability discrimination under the Rehabilitation Act, Ms. Montgomery must allege that (1) she was a qualified individual with a disability, (2) her employer knew of her disability, and (3) she suffered an adverse employment action because of her disability.  *See Congress v. District of Columbia*, 324 F. Supp. 3d 164, 175 (D.D.C. 2018) (citing *Blackwell v. SecTek, Inc.*, 61 F. Supp. 3d 149, 156 (D.D.C. 2014)); *see also Drasek*, 121 F. Supp. 3d at 154 ("Notably, under the but-for causation standard, a claim cannot succeed

---

[14] This fungibility between statutes also therefore generally extends to cases interpreting the Rehabilitation Act and Title VII.  *See Mogenhan v. Napolitano,* 613 F.3d 1162, 1166 (D.C. Cir. 2010) (noting that "Title VII of the Civil Rights Act . . . contains anti-discrimination and retaliation provisions that are indistinguishable from those of the ADA" which is incorporated into the Rehabilitation Act).

unless the protected trait—here, disability—was the reason that the employer decided to act.") (quotations removed).  Adverse employment actions include, but are not limited to, being "fired or denied a job or promotion" or "suffer[ing] any reductions in salary or benefits."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  "At the motion to dismiss stage ... an employment discrimination plaintiff need not anticipate legitimate, non-discriminatory reasons that may be proffered by the employer for the adverse employment action nor allege pretext to survive a motion to dismiss."  *Townsend v. United States*, 236 F. Supp. 3d 280, 298 (D.D.C. 2017).

Moreover, the previous motion to dismiss opinion in this action questioned the current standard for alleging an adverse action under the Rehabilitation Act, but much like back then, "the Court need not decide the proper standard here."  *Montgomery*, 2023 WL 4253490, at *8 n.14.  As the Court explained, the "D.C. Circuit has long interpreted Title VII and the Rehabilitation Act in parallel.  And 'until recently, plaintiffs in this circuit were required to allege that they had suffered objectively tangible harm in order to plead an adverse action under [both] statutes.'"  *Id.* (*quoting Bain v. Off. of Att'y Gen.*, 648 F. Supp. 3d 19, 50 (D.D.C. 2022) (internal citations omitted).  In *Chambers v. Dist. of Columbia*, 35 F.4th 870, 873 (D.C. Cir. 2022) (en banc), the D.C. Circuit adopted a more capacious view of when employment actions can give rise to a Title VII discrimination claim.  *See id.* at 874 (holding that statutory text requires only discrimination with respect to an employee's "terms, conditions, or privileges of employment" without any further test).  In *Bain*, the District Court found that while the Circuit has not yet resolved whether the *Chambers* standard applies to Rehabilitation Act claims, doing

so would be the most consistent approach.[15]  *See Bain,* 648 F. Supp. 3d at 50 (observing that

*Chambers* was based on a close reading of statutory text, and that the language of Title VII and

the Rehabilitation Act is identical in the relevant sections).

Just as before, the parties have not briefed the issue in any detail and all of Ms.

Montgomery's allegations fare the same under either test.  *Montgomery*, 2023 WL 4253490, at

*8 n.14.  In other words, some of her alleged adverse actions would satisfy the more stringent

pre-*Chambers* standard, while the rest would fail to constitute a change in terms, conditions, or

privileges of employment under the post-*Chambers* view.  Thus, the Court may proceed without

resolving the issue.

At the outset, there is no dispute that the first and second elements of a claim are present

here: Ms. Montgomery was qualified for her job, her hearing loss is a disability, and her

employer knew she was disabled.  The Secretary does not contest that Ms. Montgomery was

disabled for the purposes of the statute, nor does it dispute that she was qualified.  And Ms.

Montgomery was hired through the Schedule A authority specifically for disabled individuals,

meaning that her employer knew at the outset of her tenure that she was disabled.  Ms.

Montgomery's co-workers also commented on her hearing loss on multiple occasions.  *See* Am.

Compl. ¶¶ 7, 13.  Accordingly, the Court can move on to assessing the third element of Ms.

Montgomery's disparate treatment claim, starting with the adverse action component.

---

[15] Another court noted the same issue but did "not resolve whether *Chambers* extends to claims brought under the Rehabilitation Act because, even if actions like the revocation of telework privilege are sufficiently adverse, Defendant nevertheless had legitimate, nondiscriminatory, and nonretaliatory reasons for taking such action."  *Hartzler v. Mayorkas*, No. 20-cv-3802, 2022 WL 15419995, at *17 (D.D.C. Oct. 27, 2022).

1. Adverse Actions

As the Court noted in its previous opinion, much of Ms. Montgomery's allegations are "several scuffles and contentious meetings that, by their own, would not qualify as adverse actions." *Montgomery*, 2023 WL 4253490 at *9 (quoting *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013)).  After all, "not everything that makes an employee unhappy is an actionable adverse action.  Minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would otherwise form the basis of a discrimination suit." *Bridgeforth*, 721 F.3d at 663 (internal quotation marks omitted).  It was not an adverse action, nor did it affect the terms of employment, when Ms. Williams yelled at Ms. Montgomery in October 2018, or in December 2018 when Ms. Horton criticized Ms. Montgomery for questioning her authority. *Taylor v. Haaland*, No. 20-cv-3173, 2022 WL 990682, at *3 (D.D.C. Mar. 31, 2022) ("Although [Plaintiff's] coworkers' comments were rude and disrespectful, this Court has consistently held that such comments fail to constitute an adverse employment action").  The same is true for Ms. Montgomery's new allegation that Ms. Horton ignored her during an October 2018 staffing meeting, Am. Compl. ¶ 14, and any other allegations that are just describing statements or conversations, *see id*. ¶¶ 8, 10.  "[N]ot everything that happens at a workplace affects an employee's 'terms, conditions, or privileges of employment.'" *Chambers*, 35 F.4th at 874.

However, the Court's prior opinion did find that Ms. Montgomery pleaded two viable adverse actions. *Montgomery,* 2023 WL 4253490 at *9.  Ms. Montgomery did not receive her fiscal year 2017 performance appraisal, which also meant she did not receive a financial cash award. *Weber v. Battista,* 494 F.3d 179, 185 (D.C. Cir. 2007) (holding performance evaluation to be materially adverse where it resulted in employee not receiving a cash award); *Johnson v.*

*Bolden*, 699 F. Supp. 2d 295, 300 (D.D.C. 2010).  And Ms. Montgomery had to reapply for her job, and while she received the job back, she did not receive credit for the time she had served and her promotion to the GS-09 level was delayed, depriving Ms. Montgomery of a higher salary and harming her professional advancement.  *Johnson*, 699 F. Supp. 2d at 300 ("The plaintiff has identified adverse employment actions in his lack of promotion.").

The Secretary argues that the amended complaint omits allegations that supported the Court's finding that these were both adverse actions.  That is important because for the purposes of this motion to dismiss, "the Court is limited to the Amended Complaint, which supersedes the facts or claims stated in Plaintiff's Complaint[.]"  *Allen v. Mnuchin*, No. 18-cv-1214, 2019 WL 2581323, at *1 (D.D.C. June 24, 2019) (internal citations omitted).

First, the Secretary observes that Ms. Montgomery's amended complaint deletes some of her previous factual allegations that connect her missing 2017 performance appraisal to her not receiving a cash award.  *See* Def.'s Mem., at 9–10 (explaining withdrawn allegations).  The amended complaint mentions just once, under Count I rather than any of the factual allegation paragraphs, that Ms. Montgomery "was treated differently than her colleagues who did not have disabilities when she was not given a 2017 performance appraisal which prevented her from getting a cash award."  Am. Compl. ¶ 28.  The Court previously determined that Ms. Montgomery's failure to receive a performance appraisal "alone would not be an adverse action" but qualified as one because it "apparently prevented Ms. Montgomery from receiving a financial cash award," *Montgomery*, 2023 WL 4253490 at *9.  Now, the Secretary urges the Court to find that Ms. Montgomery has not sufficiently linked her performance appraisal and cash award, and therefore has not pleaded a viable adverse action.  *See* Def.'s Mem., at 9–10.  The Court does not agree with the Secretary.  The amended complaint's omissions are unhelpful

16

to Ms. Montgomery's claim, but there are still enough factual allegations to make clear that Ms. Montgomery did not receive a 2017 performance appraisal and that her failure to receive that appraisal prevented her from obtaining a cash award.  Am. Compl. ¶¶ 21–22, 28.

Second, the Secretary notes that the amended complaint alleges that Ms. Montgomery did not receive a promotion to the GS-09 level "as of March 5, 2019," *id.* ¶ 21, four days after she was offered a job on "March 1, 2019" without receiving credit for "the year and eight months she had already worked in the position," *id.* ¶ 20.  Although Ms. Montgomery does say, again under Count I, that her "promotion to GS 9 [sic] was delayed," *id.* ¶ 28, she has left out the original complaint's allegation that she "later received a delayed promotion to the GS-09 level at a time after she was required to receive a promotion," Compl. ¶¶ 27, 59.  The Secretary points out that this difference means Ms. Montgomery currently alleges only that she did not receive a promotion within four days after being rehired.  Def.'s Mem., at 10–11.  It is difficult to discern when exactly Ms. Montgomery believes she *should* have been promoted, which is a problem considering that "[i]n failure-to-promote cases that involve denials of increases in pay or grade, a plaintiff proves her prima facie case by showing that 'she sought and was denied a promotion for which she was qualified[ ] and that other employees of similar qualifications ... were indeed promoted at the time the plaintiff's request for promotion was denied.'"  *Naz v. Granholm*, No. 22-cv-1730, 2023 WL 6389130, at *4 (D.D.C. Sept. 30, 2023) (quoting *Taylor v. Small*, 350 F.3d 1286, 1294 (D.C. Cir. 2003)).

Nevertheless, drawing inferences in Ms. Montgomery's favor, the Court finds that she continues to allege adverse action related to her rehiring.  She alleges that she failed to receive credit for the time she held the job, and that she should have been promoted sooner than she was.  Am. Compl. ¶¶ 20, 28.  One could reasonably read these allegations to mean that Ms.

Montgomery alleges that she should have been promoted immediately upon her rehiring, if the Department had properly considered her time served.  At the least, given that GS-levels correlate pay with experience, it is easy to infer that Ms. Montgomery's prospects for promotion would eventually be adversely affected if her 20 months of experience in the role were no longer credited in her employment records.  *See, e.g.,* Am. Compl. ¶ 20 (alleging that "leadership" deleted Ms. Montgomery's SF-50 forms out of her employment file).

Even more, the allegation that Ms. Montgomery had to reapply for her job at all could be an adverse action, irrespective of the consequences when she was rehired.  A plaintiff can adequately allege an adverse employment action when "he was forced to reapply and compete for his job."  *Buitrago v. D.C.*, No. 18-cv-261, 2020 WL 1033343, at *9 (D.D.C. Mar. 3, 2020).[16] Ms. Montgomery has not alleged facts indicating that the reapplication process was onerous or competitive, nor does she allege that there was a possibility she would not be rehired at the end of the process.  *See* Am. Compl. ¶ 20 (alleging only that Ms. Montgomery was told "if [she] did not reapply, [she] would be terminated"); *id.* ¶ 10 (alleging that Ms. Montgomery was told "no other staff would know about" her reannounced position).  But as discussed in more detail below, the amended complaint includes new allegations that Ms. Montgomery did not actually need to reapply for her position for the Department to regularize it.  *Id.* ¶¶ 10, 20.  Taking that as true, the Department's insistence that Ms. Montgomery reapply may be an adverse action in its own right.  In any event, Ms. Montgomery has connected her reapplication and rehiring to other negative consequences for her employment: no credit for time served and delayed promotion.  Thus, while Ms. Montgomery has retracted certain allegations, she has pleaded enough to allege

---

[16] This case was decided before *Chambers*, 35 F.4th at 874, expanded the definition of an adverse action.

the Department's approach to rehiring her was an adverse action and has still sufficiently alleged

her failure to receive a cash award.  The Court can now move onto causation and whether Ms.

Montgomery has pleaded allegations that give rise to inference of disability discrimination.

### 2.  Causation and Inference of Disability Discrimination

Previously, the Court found that Ms. Montgomery failed to state a claim for disability

discrimination because she "ha[d] only alleged that she suffered from administrative mishaps and

less-than-ideal colleagues."  *Montgomery,* 2023 WL 4253490 at *11.  Namely, the original

complaint in this action told a story where the Department made an error when it hired Ms.

Montgomery and two other Schedule A employees, and then attempted to regularize the

appointments by requiring these employers to reapply.  Ms. Montgomery's other allegations of

scattered rude behavior from her colleagues seemingly had little to no connection to her

disability or the adverse actions she suffered.  The amended complaint could also be read in a

manner consistent with that non-actionable series of events.  However, a handful of new

allegations move the needle in supporting an inference that the Department was, in fact,

discriminating against Ms. Montgomery based on her hearing disability.

As an initial matter, Ms. Montgomery still does not dispute that her position was

incorrectly announced and that the Department would need to address that deficiency in some

regard.  She is quoted as acknowledging "the issue with regularizing the position we currently

hold," Am. Compl. ¶ 11, and at no point does the amended complaint allege that the erroneous

appointment issue was raised as pretext.  *See id.* ¶ 20 (recognizing, for example, that guidelines

on regularizing erroneous appointments would be applicable to Ms. Montgomery's situation).  At

most, Ms. Montgomery once refers to an "*alleged* erroneous appointment," which is insufficient

to contest the issue.  *Id.* ¶ 8 (emphasis added).

But according to new allegations, although Ms. Montgomery's appointment was incorrectly announced, the Department did not need to make her reapply for her job. Ms. McCollum, who made the decision about how to regularize the improper appointments, "received guidance that it was not necessary to require Ms. Montgomery to re[a]pply for her position yet she still required her to do so." Am. Compl. ¶ 10. Indeed, after receiving that guidance, Ms. McCollum still "did not follow VA Handbook 5005/65, Part I, Appendix C, Regularizing Erroneous Title 5 Appointments, which did not require that employees reapply for their positions."[17] *Id.* ¶ 20. Viewed in the light of the Department's unnecessary decision to make Ms. Montgomery reapply, Ms. Montgomery's other allegations that her supervisors treated her rudely and differently because of her disability are more concerning. If the Department did not *have* to make Ms. Montgomery reapply—and failed to give her credit for time served when she did—while Ms. Horton and Ms. Williams both made comments about Ms. Montgomery's disability, it makes it more plausible that disability discrimination influenced the Department's decision. After all, it is possible to infer discrimination from, among other things, "evidence of discriminatory statements or attitudes on the part of the employer." *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)).

---

[17] The amended complaint also alleges that the "Agency did not require employees who were not hired under Schedule A to reapply for their positions." Am. Compl. ¶ 20. Crucially, Ms. Montgomery was hired not only under Schedule A, but also through an erroneous announcement. If non-disabled employees who were similarly appointed pursuant to erroneous announcements were not required to reapply for those positions, while Ms. Montgomery and other disabled employees were required to reapply, that would support an inference of disparate treatment. *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (finding that a plaintiff can raise an inference of discrimination by showing she "was treated differently from similarly situated employees who are not part of the protected class."). Even read generously, this allegation does not make that comparison.

The amended complaint pleads that it was Ms. McCollum who made the decision to make Ms. Montgomery reapply, Am. Compl. ¶ 10.  Unlike with Ms. Horton and Ms. Williams, there are no allegations where Ms. McCollum made any rude comments or had any verbal disagreements with Ms. Montgomery.  *See id.* ¶¶ 10, 20.  So while Ms. Montgomery alleges that Ms. McCollum "did not speak to other employees without a healing [sic] disability in this way," there are no indications that Ms. McCollum's communications with Ms. Montgomery were unprofessional or inappropriate.  *Id.* ¶ 10.  Still, Ms. McCollum made her decision after making "leadership" "aware of her decision," who then said "she could move forward."  *Id.*  This leadership may have included Ms. Horton and Ms. Williams, who were both supervisors of Ms. Montgomery.  Regardless, Ms. Horton and Ms. Williams's behavior helps describe the tenor of the workplace and how other decisionmakers and employees may have felt about Ms. Montgomery, so the Court will look to those allegations as further evidence of discrimination. *Sharpe v. Bair*, 580 F. Supp. 2d 123, 133 (D.D.C. 2008) (observing that a plaintiff may use "indirect evidence" to support an inference that an employer took an action because of the plaintiff's membership in a protected class).

Ms. Montgomery's conflict with Ms. Williams shows that her disability was at issue in the workplace.  Her repeated disputes with Ms. Williams—where Ms. Williams did not provide a proper performance evaluation and then failed to approve Ms. Montgomery's time entries— culminated with Ms. Williams commenting that Ms. Montgomery "can't hear."  Am. Compl. ¶¶ 12–13, 21.  This statement prompted Ms. Montgomery to ask Ms. Williams if she was discriminating against her disability.  *Id.* ¶ 13.  Ms. Williams denied making the statement about Ms. Montgomery's hearing, and then kicked her out of her office.  *Id.*

Ms. Montgomery also asserts that another supervisor, Ms. Horton, targeted her based on her disability. Ms. Montgomery newly alleges that "Ms. Horton believed that individuals hired on Schedule A should not work in Human Resources," *id.* ¶ 8, which mirrors another allegation that Ms. Horton said that Ms. Montgomery and two other disabled employees "should be terminated" and "should have never been hired in Human Resources," *id.* ¶ 11. As damning as these allegations may sound on first impression, they could also be viewed as Ms. Horton merely stating the results of her January 2018 "Fact Finding" that Ms. Montgomery and the other two Schedule A employees were hired pursuant to an incorrect announcement. *Id.* ¶¶ 8, 10. Again, Ms. Montgomery has not contested the accuracy of that determination.[18] More evidence that these allegations about Ms. Horton are anodyne is that she self-identified as an "expert on Schedule A" and devised options for regularizing the appointments, including allowing another employee to use her master's degree for that purpose. *Id.* ¶ 11.

But other allegations indicate that Ms. Horton held Ms. Montgomery's disability against her. Ms. Montgomery describes that after Ms. Horton overheard her dispute with Ms. Williams, she called Ms. Montgomery into her office and asked her if she was disabled. *Id.* ¶ 14. It is odd that Ms. Horton would ask that question, given the other allegations that by this time, she was already involved in Ms. Montgomery's appointment issue and knew she was a disabled Schedule A employee. *Id.* ¶¶ 8, 11. Shortly after Ms. Montgomery "confirmed her disability" in this conversation, there were multiple incidents where Ms. Horton treated Ms. Montgomery with hostility, in contrast with how she interacted with other staff who did not have a hearing

---

[18] Also, the regulation authorizing Schedule A hiring, 5 C.F.R. § 213.3102(u), "is permissive; there is no obligation to hire a disabled applicant" under this authority. *Ward-Johnson v. Glin,* No. 19-cv-00534, 2020 WL 2770018, at *9 (D.D.C. May 28, 2020). An attempt to fix an improper exercise of Schedule A hiring does not, on its own, support an inference of disability discrimination.

disability.  *See id.* ¶¶ 14, 17.  One of these incidents seemingly involved Ms. Horton pretending she did not hear Ms. Montgomery, which would also connect this behavior to Ms. Montgomery's disability.  *Id.* ¶ 14.  Given these events and the Court's obligation to make inferences in Ms. Montgomery's favor, it declines to adopt an innocuous interpretation of the allegation that "Ms. Horton believed that individuals hired on Schedule A should not work in Human Resources."  *Id.* ¶ 8.

"[W]hen an employment discrimination complaint contains fulsome factual context for the challenged adverse employment action, those allegations must be considered collectively in evaluating the reasonableness and plausibility of the inferences urged by the plaintiff."  *Townsend*, 236 F. Supp. 3d at 298.  In sum, it is noteworthy that two different supervisors allegedly expressed hostility against Ms. Montgomery that was connected to her disability, one of those supervisors reportedly took issue with hiring Schedule A disabled employees, the other supervisor failed to give Ms. Montgomery a proper performance appraisal, and another employee forced Ms. Montgomery to unnecessarily reapply for her job.

To be sure, Ms. Montgomery has not made strong connections between these events, and the "stray remarks of nondecisionmakers are not sufficient, standing alone, to raise an inference of discrimination."  *Markowicz v. Johnson*, 206 F. Supp. 3d 158, 176 (D.D.C. 2016) (quoting *Aliotta v. Bair*, 614 F.3d 556, 570 n.6 (D.C. Cir. 2010)).  It is not alleged how Ms. Horton and Ms. Williams influenced Ms. McCollum's decision to make Ms. Montgomery reapply, or whether they directed that Ms. Montgomery should not receive credit for time served.  And it would be illuminating to know how "Chief Human Resources Officer" Ms. Carrol was involved in these events, which is unstated in the amended complaint.  *Id.* ¶ 6.  Ms. Carrol seems to have

been Ms. Montgomery's most senior supervisor, and there are no allegations of her expressing anti-disability sentiment.  *Id.*

Regardless, given that Ms. Horton conducted the fact-finding into the erroneous appointments and later developed a plan for regularizing a different employee so that she did not have to reapply, Am. Compl. ¶¶  8–11, it appears that Ms. Horton "played a role in the decisionmaking process, even if the ultimate decision did not rest with [her]," *Markowicz*, 206 F. Supp. 3d at 176 (allowing discrimination claim to go to trial based on remarks of individual involved in decisionmaking process).  More plainly, considering that they were both her supervisors, Ms. Horton and Ms. Williams's feelings about Ms. Montgomery and her disability "speak[] to the decisional process" on how to handle her employment.  *Id.*

Additionally, with respect to that process, the amended complaint lacks information on how the Department would typically handle erroneous appointments.  Yet, to the extent that Ms. McCollum did not follow the Department's handook policies, "there was an unexplained deviation from [the Department's] standard practices – and such a deviation 'can justify an inference of discriminatory motive.'" *Jeffries v. Barr*, 965 F.3d 843, 858 (D.C. Cir. 2020) (quoting *Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003)).

"The burden of showing a prima facie case at the pleading stage is not onerous." *Easaw v. Newport*, 253 F. Supp. 3d 22, 26 (D.D.C. 2017) (internal quotation omitted).  Therefore, viewing the allegations as a whole, the Court finds that Ms. Montgomery has alleged facts that plausibly support an inference that she suffered adverse actions based on her disability.  In isolation, Ms. Montgomery's allegations about any single individual or event may not be enough.  But, at least at this early point in the case, the repeated behavior implicating Ms. Montgomery's disability – and the absence of any other explicable justification – provides sufficient reason to

believe that it was discriminatory when the Department unnecessarily made Ms. Montgomery reapply for her job and then deprived her of credit for time served.  Additionally, although the Court previously held that Ms. Montgomery had not sufficiently alleged that her failure to receive a performance appraisal was connected to her disability, it narrowly reaches a different conclusion now in the context of the new allegations concerning Ms. Horton and the Department's unexplained decision to make Ms. Montgomery reapply.  *Montgomery*, 2023 WL 4253490, at *11.  Either way, "there is nothing to be gained in efficiency by dismissing" this portion of the claim, as the alleged incidents with Ms. Williams are also relevant to whether the reapplication process was motivated by discrimination.  *Doe v. Austin*, No. 22-cv-3474, 2024 WL 864270, at *11 (D.D.C. Feb. 29, 2024).

In later stages of the litigation, the Secretary may introduce information or arguments to rebut Ms. Montgomery's assertions of discrimination.  That may include a showing that Ms. McCollum did not depart from the department policy in making Ms. Montgomery reapply without credit for time served, or evidence refuting the amended complaint's narrative about Ms. Horton and Ms. Williams's beliefs and actions.  And it may demonstrate that Ms. Williams's failure to provide a proper 2017 performance appraisal had nothing to do with Ms. Montgomery's disability.  At this juncture, though, the Court must take her allegations as true and cannot say that Ms. Montgomery has failed to state a claim.  The Secretary's motion to dismiss Ms. Montgomery's disparate treatment claim is denied.

### B.  Ms. Montgomery's Hostile Work Environment Claim Also Survives

Like her disparate treatment claim, Ms. Montgomery's hostile work environment claim can proceed.  To demonstrate a hostile work environment, "a plaintiff must show that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "Determining whether an actionable hostile environment claim exists requires an examination of all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002). "Importantly, the plaintiff must establish that the allegedly harassing conduct complained of was based on a protected characteristic . . . ." *Byrd v. Vilsack*, 931 F. Supp. 2d 27, 45 (D.D.C. 2013) (citation omitted).

Moreover, "not all abusive behavior, even when it is motivated by discriminatory animus, is actionable." *Jones v. District of Columbia*, 314 F. Supp. 3d 36, 61 (D.D.C. 2018) (quoting *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002)). The standard for hostile work environment cases is a "'high bar' designed to 'filter[ ] out complaints attacking the ordinary tribulations of the workplace" and prevent federal civil rights statutes from "imposing a general civility code." *Joyner v. Morrison & Foerster LLP*, No. 20-cv-1440, 2023 WL 6313194, at *7 (D.D.C. Sept. 27, 2023) (quoting *Mohmand v. Broad. Bd. of Governors*, 2018 WL 4705800, at *6 (D.D.C. Sept. 30, 2018)).

Finally, "although a plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard, neither can a court dismiss a hostile work environment claim merely because it contains discrete acts that the plaintiff claims (correctly or incorrectly) are actionable on their own." *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011). That said, "[u]se of the same discrete acts, upon which the

plaintiff bases [her] discrimination ... claims, to support a hostile work environment claim is disfavored." *Townsend*, 236 F. Supp. 3d at 312.

 Here, although Ms. Montgomery's hostile work environment claim is duplicative, she narrowly survives the motion to dismiss.  First, assuming that her unpleasant interactions with Ms. Horton and Ms. Williams were motivated by anti-disability animus, as the Court has found is plausible, these conflicts alone are too minor to state a claim.[19] *Goode v. Billington*, 932 F. Supp. 2d 75, 89 (D.D.C. 2013) ("[C]asual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of action.") (quoting *Park v. Howard Univ.*, 71 F.3d 904, 906 (D.C. Cir. 1995)).  Ms. Montgomery describes only a few specific exchanges with Ms. Williams or Ms. Horton, none of which involved extreme behavior or language.  Conduct that amounts merely to "a series of petty insults, vindictive behavior, and angry recriminations'" is "not actionable" under a hostile work environment framework.[20] *Brooks v. Grundmann*, 748 F.3d 1273, 1277–78 (D.C. Cir. 2014) (internal quotation omitted).

 However, hostile work environment claims depend on the "totality of circumstances," *Baloch*, 550 F.3d at 1201, and so the Court must consider the reapplication process and the failure to receive a performance appraisal as part of that totality, *see also Brooks*, 748 F.3d at 1276 ("[i]n discerning severity and pervasiveness, [the Court] assess[es] the timeline of events as a whole.").  In *Baloch,* 550 F.3d at 1200–01, the panel dismissed a hostile work environment

---

[19] The Court previously determined that Ms. Montgomery's allegation that Ms. Horton described her as "ghetto" did not state a claim for a racially discriminatory hostile work environment. *Montgomery*, 2023 WL 4253490, at *6.  This statement does not seem to bear any relation to Ms. Montgomery's disability.

[20] Although Ms. Montgomery alleges that in April 2018 she stood up to address a hostile work environment perpetuated by the head of Human Resources at the Medical Center,  Am. Compl. ¶ 9, she does not link this environment to disability discrimination or describe it in any detail, nor does she connect it to any other events.

claim because the plaintiff's "claims of harm [were] not supported by evidence of tangible workplace consequences, whether financial, physical, or professional."  Here, Ms. Montgomery has alleged more than that, because the pattern of behavior includes her being unnecessarily forced to reapply for her job and then receiving a delayed promotion, as well as financial consequences from the lack of a performance appraisal.  *See, e.g., Doe*, 2024 WL 864270, at *7–8 (allowing hostile work environment claim to move forward when, among other incidents, the pattern of behavior included the loss of the plaintiff's job).  So while Ms. Montgomery would not be able to meet the hostile work environment standard purely based on the interactions she had with her supervisors, nor solely on any of the discrete actions constituting her disparate treatment claim, at this juncture of the litigation where the Court must draw all inferences in Ms. Montgomery's favor, these combined allegations are "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Harris*, 510 U.S. at 21 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67).

As noted previously, the Secretary will have an opportunity to rebut Ms. Montgomery's claims.  Indeed, the same showings that might defeat her disparate treatment claim would also likely be fatal for the hostile work environment claim, such as evidence revealing that factors other than disability discrimination motivated the reapplication process and the missing performance appraisal.  At this point, it is too early to make those counter-arguments.  Thus, the Court will deny the motion to dismiss the hostile work environment claim.

**V.  CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss Plaintiff's Amended Complaint, ECF No. 23, is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 29, 2024                                          RUDOLPH CONTRERAS
                                                                United States District Judge